(No. 77177.—

*In re* W.C., a Minor (The People of the State of Illinois, Appellee, v. W.C., Appellant).

*Opinion filed October 19, 1995.*

Nathan P. Eimer, Joseph D. Kearney, Robert R. Kimball, Kathleen M. Mulligan and J. Tyson Covey, of Sidley & Austin, of Chicago (Karen M. Berman and Maria Woltjen, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson and Terence M. Madsen, Assistant Attorneys General, of Chicago, and Renee Goldfarb, Peter Fischer and Elizabeth A. Scholz, Assistant State's Attorneys, of counsel), for the People.

Robert C. Drizin, Assistant Public Defender, of Chicago, for amicus curiae Rita A. Fry, Cook County Public Defender.

Michael J. Pelletier, Deputy Defender, of Chicago, for amicus curiae Theodore A. Gottfried, State Appellate Defender.

JUSTICE FREEMAN delivered the opinion of the court:

Pursuant to the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 801—1 et seq.), the State filed a delinquency petition in the circuit court of Cook County, alleging respondent, W.C., is accountable (Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c)) for the first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(2)) of Carey

Long. Following an adjudicatory hearing, the circuit court found the allegations proven beyond a reasonable doubt and determined W.C. to be a delinquent minor. The circuit court found also that the murder allegations, stated in the form of two counts, merged together for the single determination of delinquency. At a subsequent dispositional hearing, the circuit court adjudged W.C. a ward of the court and committed him to the juvenile division of the Illinois Department of Corrections for an indeterminate period. W.C. appealed.

The appellate court held, *inter alia*, that: (1) W.C. waived a claimed violation of his right to remain silent and to counsel by failing to include the claim in a written "post-trial" motion and that, even so, the claimed violation did not rise to the level of plain error; (2) the allegations supporting the delinquency adjudication were proven beyond a reasonable doubt; and (3) no error occurred in adjudicating W.C. delinquent based on two counts alleging first degree murder, despite that only one person had been killed. (261 Ill. App. 3d 508.) We granted W.C.'s petition for leave to appeal. (145 Ill. 2d R. 315.) Based on the following considerations, we now affirm the circuit court's judgment of W.C. as a delinquent minor and a ward of the court.

## ISSUES

We are asked to decide: (1) whether a claimed constitutional violation raised in a delinquency adjudication was waived on appeal for the failure to also make such claim in a written post-adjudication motion; (2) whether respondent's waiver of the right to remain silent and to counsel was knowing and intelligent such that his statement to police was properly admitted into evidence; (3) whether respondent was found delinquent based on proof beyond a reasonable doubt; and (4) whether error occurred by finding that respondent was delinquent and committing him to the Department of

Corrections based on two offenses of first degree murder where only one person was killed.

## FACTUAL BACKGROUND

On May 28, 1992, Carey L. Long, "Skip," aged 29 years and a drug abuser, was fatally shot in the face and back by Othenio Lucas, "Pooh-Pooh," aged 17 years, a reputed drug dealer. Shortly after the shooting, Long's six-foot, one-inch, 180-pound body was found by police lying in the rear courtyard area of an apartment building. On May 29, 1992, police interviewed John Crafton pursuant to their investigation of Long's death. As a result of the interview, police learned that W.C. had been present at the scene of the shooting and in the company of William Hodges, "Juan," aged 14 years. W.C. was then 13 years old, five feet, two inches tall and weighed 90 to 100 pounds. Based on the information obtained from Crafton, police went to W.C.'s home and requested that his mother bring him to the police station.

W.C. and his mother, accompanied by two police officers with whom the mother was familiar, arrived at the police station at around 6 p.m. W.C. was taken into temporary custody by officers at the station, and he and his mother were taken to an interview room. Once there, Detectives Cliff Gehrke and Joseph Fine read *Miranda* warnings to W.C. directly from their police manual. According to the officers, W.C. indicated to them that he understood his rights by responding "I understand" to each *Miranda* query. W.C. agreed to talk and gave an oral statement in the presence of his mother, the detectives and police youth officer Deanna Hall. Although W.C. initially began to relate a false version of events, his mother soon directed him to tell the truth, and W.C. related an apparently truthful version. Gehrke took notes. At some point, Fine left the interview room to contact an assistant State's Attorney. At another point,

W.C. and his mother had an opportunity to privately talk when both officers left the room.

After a brief period, Assistant State's Attorney Diane Sheridan entered the interview room and repeated *Miranda* warnings to W.C. According to the State, Sheridan explained the warnings to W.C. and he indicated that he understood them. As Sheridan took notes, W.C. repeated his prior oral statement. Sheridan then left the room briefly to reduce her notes to a formal written statement. She subsequently returned to the room and read the written statement aloud to W.C. and his mother because W.C.'s mother was upset and neither she nor W.C. possessed the ability to read the document. All persons present, W.C., his mother, Sheridan, Fine and Hall signed all three pages of the document, which stated in pertinent part:

> "After being advised of his constitutional rights, and stating he understood each of those rights, and after being advised that he did not have to talk to [Sheridan] and also understanding that Diane Sheridan was an Assistant State's Attorney, a lawyer and prosecutor and not his lawyer, [W.C.] agreed to give a truthful account of what happened on May 28, 1992.
>
> [W.C.] states that he is 13 years old and goes to Libby School. [W.C.] states that he can understand English but cannot read very well. [W.C.] agrees to have his mother \*\*\* read him his statement so he can understand it. \*\*\*
>
> [W.C.] states that his nickname is Bey. [W.C.] states on May 28, 1992 at around 8:00 at night, he was at 5447 S. Indiana Chicago. [W.C.] states that Pooh-Pooh, also known as, Othenio Lucas had hidden his drugs at an abandoned building. [W.C.] states that a man, Skip had gone into the building and took Pooh-Pooh's drugs. [W.C.] states that Pooh-Pooh had a gun also in the building and Pooh-Pooh went to get the gun when he found out the man, Skip had taken his drugs. [W.C.] states that Pooh-Pooh said he was going to kill the man for taking his drugs. [W.C.] states he was with Juan Hodges and they each picked up a stick and hit the man who took the drugs. [W.C.] states he hit

the man in the arm and Juan hit the man in the head but the stick broke. [W.C.] states that Pooh-Pooh came out of the building with the gun and shot the man. [W.C.] states he heard the gun go off four times. [W.C.] states that he and Juan and Pooh-Pooh all ran away.

*** [W.C.] understands that he can add anything or change anything by asking Diane Sheridan or his mother *** to do so now. [W.C.] states that there were two other people with Skip. [W.C.] states that Pooh-Pooh shot four times at Skip while Skip was running away. [W.C.] states that Pooh-Pooh then fired some shots at the other two people."

The questioning concluded around 7:40 p.m. W.C. was detained, pending a determination of delinquency based on two counts of first degree murder by accountability.

The circuit court conducted a section 5—4 transfer hearing to decide whether W.C. would be criminally prosecuted as an adult. (Ill. Rev. Stat. 1991, ch. 37, par. 805—4.) Officer Hall testified that although she remembered reading in the written statement that W.C. had said he knew Lucas was going to get a gun to kill Long, she did not remember hearing him say that during the interrogation. W.C.'s written statement was offered to and received by the court without objection. See *People v. Taylor* (1979), 76 Ill. 2d 289, 302-03 (transfer hearing proceedings not adjudicatory in nature).

The social investigation report indicated that W.C. had received three station adjustments and that three charges once brought against him had been dropped with leave to reinstate. W.C.'s school records indicated that he was in sixth grade, had received failing grades throughout his entire education and had never been evaluated for special educational services. Dr. Diane Stone, a Chicago board of education school psychologist, testified at the transfer hearing that W.C. was illiterate and moderately mentally retarded with an IQ of 48, which Stone stated was the equivalent developmentally of a six- to eight-year-old. A psychological examination sum-

mary, prepared by a court psychologist, also described W.C. as being moderately mentally retarded, stuttering, and possessing the emotional maturity of a six- to seven-year-old.

W.C.'s mother testified, confirming that she was a poor reader. When asked why she had signed the written statement, W.C.'s mother replied, "[I] had signed it because the State had told me and my son to sign this paper because these are the words my son have said, and me and my son signed it." Among other matters, W.C.'s mother did not remember hearing him state that Lucas told him he was going to get a gun and kill Long.

The circuit court subsequently found that in the best interests of the minor and the security of the public W.C. should not be transferred to the criminal division for trial. The court denied the State's petition for transfer.

The adjudication phase commenced in the juvenile division. W.C.'s counsel filed a motion to suppress his statement on the basis that he did not knowingly and intelligently waive his rights to remain silent and have an attorney present.

Evidence presented by respondent at the transfer hearing was introduced by stipulation. In addition, Dr. Stone testified as W.C.'s expert in determining the cognitive developmental and language skills levels of children and adolescents. Based on psychological, achievement and language skills tests she administered to W.C., it was Stone's opinion that he was unable at the time of his arrest to understand *Miranda* warnings. Two police officers, who had arrested W.C. on two previous occasions, also testified that they had read W.C. *Miranda* warnings on those occasions, and that he had indicated that he understood the warnings, in one instance even refraining from asking or answering further questions. Sheridan testified that she gave W.C. an explanation of

the *Miranda* warnings before questioning him and that he indicated that he understood them. Officer Fine confirmed Sheridan's testimony. W.C. testified by responding in few words, by not remembering and with inconsistency. The circuit court denied the motion to suppress W.C.'s statement.

At the adjudicatory hearing, the State's evidence consisted of the testimony of an investigating police officer concerning his observations of Long's body at the crime scene, the stipulated testimony of the medical examiner as to the cause of death, the medical examiner's report and W.C.'s written statement. Other than W.C.'s written statement, there was no incriminatory evidence. W.C. did not testify and presented no evidence. The circuit court found that the State's evidence established beyond a reasonable doubt that W.C. was accountable for the first degree murder of Long. The circuit court, accordingly, determined W.C. to be delinquent "as to the charge of murder *** under both counts" and stated that the counts merged for one finding of delinquency.

The social investigation report was supplemented for the dispositional determination. In the report, the Juvenile Detention Center confirmed that W.C. was a nonreader, functioned academically at the second-grade level, had a very small sight vocabulary and a comprehension level between second and third grade. W.C. was also reported as being unable to tell time because he could not remember the difference between the hour and minutes. W.C. was adjudicated a ward of the court.

After considering recommendations that W.C. be placed on probation in either a therapeutic day center or a residential treatment center, the circuit court ordered W.C. transferred to the custody of the Department of Corrections. The dispositional order indicated that commitment was based on two offenses of first

degree murder. Respondent's counsel filed no written post-adjudicatory motion and simply appealed.

## ANALYSIS

### I

#### Waiver of Juvenile's *Miranda* Claim for Failure to File Written Post-Adjudicatory Motion

On appeal, respondent claimed a due process violation of his right to remain silent and right to the presence of counsel. The appellate court held that waiver applies to appeals from delinquency findings and that respondent waived the claim by failing to include it in a written "post-trial" motion. 261 Ill. App. 3d at 511-12.

In ruling, the appellate court was persuaded by two decisions from the Fourth District. (See *In re T.L.B.* (1989), 184 Ill. App. 3d 213, 219 (approving application of waiver principles to delinquency proceedings for failure to raise issue in circuit court); *In re F.L.W.* (1979), 73 Ill. App. 3d 355, 358 (finding waiver where issue not raised in circuit court and in motion for reconsideration).) The appellate court cited, by way of contrast, two First District decisions. (See *In re C.L.* (1989), 180 Ill. App. 3d 173, 176-77 (holding post-trial motion, delineated in section 116—1(b) of the Code of Criminal Procedure of 1963, not applicable to delinquency proceedings and unnecessary to preserve issue for review); *In re W.D.* (1990), 194 Ill. App. 3d 686, 700 (same).) The appellate court interpreted these latter two decisions as holding that waiver is inapplicable to appeals from delinquency proceedings. The appellate court expressed disagreement with this rationale. 261 Ill. App. 3d at 512.

Respondent contends that the appellate court should not have fashioned a new rule, but should have adhered to the prevailing practice within the First District of permitting review of claimed errors raised in circuit court delinquency proceedings, though not included in

written post-adjudication motions. Respondent asserts that the issue is not, as contended by the State, whether waiver, in general, is applicable to delinquency proceedings. Rather, the issue is whether there is basis in law for requiring a written post-adjudication motion in order to preserve claimed errors raised in delinquency adjudications.

Respondent asserts that neither Supreme Court Rule 660(a) (134 Ill. 2d R. 660(a)), pertaining to appeals under the Juvenile Court Act (Act), nor the Act incorporates the requirement of a section 116—1(b) written post-trial motion (Ill. Rev. Stat. 1991, ch. 38, par. 116—1(b)) within delinquency appellate or post-adjudication procedures. (See *In re C.L.*, 180 Ill. App. 3d 173; *In re W.D.*, 194 Ill. App. 3d 686.) That the State can point to no decisions squarely holding that a post-adjudication motion is required to preserve error in delinquency proceedings speaks to the absence of a legal basis for the State's argument. Respondent further asserts that the appellate court compounded the error in fashioning the new rule by retroactively applying it to him. Such retroactive application, he contends, would be violative of his constitutional right to due process.

The State argues that waiver, as applied within the adult criminal appeals process, applies to juvenile delinquency appeals. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186 (claim of error must be raised initially in trial court and in written post-trial motion).) The State relies on authority finding waiver based on a failure to initially raise an issue in the circuit court. (See *In re J.P.J.* (1985), 109 Ill. 2d 129, 139-40 (jurisdictional issue waived where not raised in the circuit court); *In re T.L.B.*, 184 Ill. App. 3d 213; *In re F.L.W.*, 73 Ill. App. 3d 355.) The State also relies on *In re J.G.* (1989), 182 Ill. App. 3d 234, which approved waiver of an appeal for failure to file a motion to withdraw an admission in

compliance with Supreme Court Rule 604(d) (134 Ill. 2d R. 604(d)). The State additionally contends that the rationale supporting *In re W.D.* and *In re C.L.*, relied on by respondent, is now obsolete.

There is no question that claimed errors in delinquency proceedings are often waived on appeal for the failure to preserve those claims by first raising them in the circuit court. (See *In re J.P.J.* (1985), 109 Ill. 2d 129, 136-37 (finding waiver for failure to raise issue in circuit court); *In re Greene* (1979), 76 Ill. 2d 204 (issue not raised at circuit court level is considered waived); *In re Tingle* (1977), 52 Ill. App. 3d 251, 257 (same).) Waiver principles are generally applied in minor delinquency proceedings as well as in adult criminal proceedings for failure to initially raise an issue at the circuit court level. (See *In re T.L.B.*, 184 Ill. App. 3d at 219.) The specific question here, however, is whether a written post-adjudicatory motion is additionally required to preserve a claimed error in delinquency proceedings under the Act.

The overriding purpose of the Juvenile Court Act is to ensure that the best interests of the minor, the minor's family, and the community are served. (See Ill. Rev. Stat. 1991, ch. 37, par. 801—2; *In re J.J.* (1991), 142 Ill. 2d 1, 8.) Proceedings under the Act are not criminal. (See *In re Beasley* (1977), 66 Ill. 2d 385, 389.) Although a delinquency proceeding retains certain adversarial aspects, it is not in the usual sense an adversarial proceeding, but one to be administered in a spirit of humane concern for and to promote the welfare of the minor. (See *In re Beasley*, 66 Ill. 2d at 389.) Delinquency proceedings are therefore protective in nature and the purpose of the Act is to correct and rehabilitate, not to punish. See *In re M.D.B.* (1984), 121 Ill. App. 3d 77, 83; see also *In re A.J.* (1985), 135 Ill. App. 3d 494.

Even so, parties in such proceedings are afforded due process safeguards such as the right to counsel,

confrontation of witnesses, cross-examination, the right to remain silent (*In re Application of Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428), and the right to adequate notice (*In re J.P.J.*, 109 Ill. 2d at 135). Transfer of a juvenile for criminal prosecution must also comport with due process. (See *People v. P.H.* (1991), 145 Ill. 2d 209.) Section 1—2(3)(a) of the Act also specifically provides that the procedural rights of the minor shall be the rights of adults unless specifically precluded by laws enhancing their protection (Ill. Rev. Stat. 1991, ch. 37, par. 801—2(3)(a); see also *In re Beasley*, 66 Ill. 2d at 391 (referring to section 1—2(3)(a) as affording due process safeguards).) Accordingly, with the exception of bond, where such enhancement occurs (Ill. Rev. Stat. 1991, ch. 37, pars. 805—9, 805—10), Illinois courts have not limited juveniles' *right* to pretrial motions. (*Cf. In re Dominique F.* (1991), 145 Ill. 2d 311 (affirming juvenile's right to change of judge).) Further, at the adjudicatory hearing, in the court's consideration of whether a minor is a delinquent, the standard of proof and the rules of evidence applicable are those in the nature of criminal proceedings. Ill. Rev. Stat. 1991, ch. 37, par. 805—18; see also *In re Urbasek* (1967), 38 Ill. 2d 535 (requiring proof beyond reasonable doubt).

Nonetheless, the application of such safeguards and standards does not transform delinquency proceedings into criminal proceedings or indicate that a fully adversarial process is developed. (See *In re Beasley*, 66 Ill. 2d at 390 (rejecting use of Supreme Court Rule 402 in delinquency process); *People ex rel. Carey v. White* (1976), 65 Ill. 2d 193 (best interests of minors under traditional dispositional alternatives would not be served by jury trials); *People ex rel. Hanrahan v. Felt* (1971), 48 Ill. 2d 171 (allowing civil discovery in juvenile practice, but permitting court, in its discretion, to regulate use); *In re R.R.* (1979), 75 Ill. App. 3d 494 (petition for post-

conviction relief not available in juvenile delinquency proceedings).) The Act contains no statement incorporating general criminal practice rules or the provisions of the Code of Criminal Procedure.

With respect to delinquency appeals, Supreme Court Rule 660(a) provides that such proceedings shall be governed by the "rules applicable to criminal cases." (134 Ill. 2d R. 660(a).) Appeals in all other juvenile proceedings under the Act are governed by the "rules" applicable to civil cases. (See 134 Ill. 2d R. 660(b).) A few examples of supreme court rules applicable to criminal cases that also govern delinquency appeals are Rule 615(a) (134 Ill. 2d R. 615(a)), recognizing plain error, and Rule 604(d) (134 Ill. 2d R. 604(d)), requiring a motion to withdraw a guilty plea and vacate the judgment in order to appeal. (See *In re Sanders* (1980), 81 Ill. App. 3d 843, 847-48 (applying Rule 615(a)); *In re J.G.*, 182 Ill. App. 3d at 235-36 (applying Rule 604(d) and Rule 605(b)); *cf. In re Pulido* (1978), 69 Ill. 2d 393 (applying Rule 609(b), right to bail).) Quite obviously, Rule 660(a) accomplishes a limited incorporation into the Act of those supreme court rules which may pertain to delinquency appeals.

Concerning the criminal appeals process, section 116—1(b) of the Code of Criminal Procedure of 1963 (Code) provides for the filing of a written motion for a new trial following the entry of a finding or return of a verdict. (Ill. Rev. Stat. 1991, ch. 38, par. 116—1(b).) This particular post-trial motion has been a part of "the statutory procedure" for criminal review in Illinois for more than a century. (Ill. Ann. Stat., ch. 38, par. 116—1(b), Committee Comments—1963, at 207 (Smith-Hurd 1990).) In *People v. Enoch*, 122 Ill. 2d at 186, this court held that a motion for a new trial as well as a claim of error or objection at trial are necessary to preserve a claim for review.

The requirement that the claim of error be included in a post-trial motion rests on a different basis than the requirement that an objection be raised at trial. (See *Enoch*, 122 Ill. 2d at 187.) It is a fundamental concept of our adversarial system that counsel object at trial to errors. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 577; *People v. Roberts* (1979), 75 Ill. 2d 1, 10.) The requirement for a written post-trial motion, however, is statutory. See *Enoch*, 122 Ill. 2d at 187.

The rationale underlying the requirement of an objection at trial is to effect a timely resolution of evidentiary questions at trial. (See *Carlson*, 79 Ill. 2d at 577.) The purpose of requiring a written motion for a new trial, specifying the alleged errors, is to provide the court the opportunity to grant a new trial if warranted and to narrow the appeal to those errors considered significant by trial counsel. See *Enoch*, 122 Ill. 2d at 186.

For failure to comply with the statutory requirement of a written motion for a new trial, this court has determined that criminal review will be limited. (See *Enoch*, 122 Ill. 2d at 190.) Nonetheless, this court has also interpreted the rule of waiver (134 Ill. 2d R. 341(e)(7)) as an admonition to the parties and not as a limitation on the jurisdiction of reviewing courts. *In re C.R.H.* (1994), 163 Ill. 2d 263.

Having reviewed the Juvenile Court Act, Supreme Court Rule 660(a), section 116—1 of the Code, as well as waiver principles, we conclude the following. We agree with respondent and his cited authorities that neither the provisions of the Juvenile Court Act nor Supreme Court Rule 660(a) incorporates within delinquency procedures the requirement of a section 116—1 motion for a new trial. While the Act is construed to provide for procedures protective of juveniles' due process rights, it incorporates expressly only criminal rules of evidence and the burden of proof standard. See *In re C.L.*, 180 Ill. App. 3d at 176-77; *In re W.D.*, 194 Ill. App. 3d at 700-01.

Similarly, we construe Supreme Court Rule 660(a), by the use of the term "rules," to refer simply to the other supreme court rules. Thus, Rule 660(a) does not incorporate wholesale the general rules of criminal practice or the Code of Criminal Procedure, including section 116—1(b). (See *In re C.L.*, 180 Ill. App. 3d at 176-77; *In re W.D.*, 194 Ill. App. 3d at 700-01.) Also, in reference to *In re C.L.* and *In re W.D.*, we disagree with the State that the entire rationale of these decisions is now obsolete. The constructions of the Act and of Supreme Court Rule 660(a) undertaken by these decisions remain unaffected by the now-obsolete analogy drawn between criminal bench and juvenile wardship proceedings by *In re Driver* (1977), 46 Ill. App. 3d 574. As stated previously, we agree with the constructions in *In re C.L.* and *In re W.D.*

Furthermore, although the State relies on authority, *In re J.G.*, approving of waiver of an appeal for the failure to file a post-judgment motion to withdraw an admission (134 Ill. 2d R. 604(d)), we are not presented here with those facts. W.C. entered no admission such that the requirement of a Rule 604(d) motion might come into play. While arguably a Rule 604(d) motion might be viewed as a "post-trial" motion because it follows trial, we do not decide on these facts whether such a motion is required to take a delinquency appeal. (*Cf. In re A.D.* (1992), 228 Ill. App. 3d 272 (review of merits despite lack of motion to withdraw admission); *In re F.D.* (1980), 89 Ill. App. 3d 223 (Supreme Court Rule 604(d) applies to delinquency appeal); *In re Buchanan* (1978), 62 Ill. App. 3d 463 (rejecting application of Supreme Court Rule 604(d) to delinquency appeal).) Accordingly, we consider *In re J.G.* inapposite.

The State additionally argues, however, that because the plain error rule (134 Ill. 2d R. 615(a)) applies to delinquency appeals under supreme court rule (see *In re*

*Sanders* (1980), 81 Ill. App. 3d 843, 847), it therefore follows that waiver, encompassing the criminal process requirement of a post-trial motion, applies to such appeals. We are not persuaded by this argument. It does not follow that, because Rule 615(a) is applied as an exception to waiver in delinquency appeals, as in criminal appeals, a delinquency waiver rule must be comprised of the same requirements as the criminal waiver rule. Put simply, application of the exception cannot dictate the requirements of the general rule. Criminal case law also belies this reasoning. The plain error rule has been applied historically as an exception to waiver for a failure to raise an issue or object at trial. (See *Carlson*, 79 Ill. 2d at 577-78.) Thus, the plain error rule is not a product of the criminal waiver rule in *Enoch*, and its application in delinquency appeals does not mean that criminal review requirements are thereby transposed here.

Finally, the State argues that the concerns which underlie the application of waiver in other contexts (*In re J.P.J.*, 109 Ill. 2d 129 (avoidance of unfair advantage gained by party's failure to establish a record); *Enoch*, 122 Ill. 2d at 186 (avoidance of open-ended appeals)) come to bear here. Regardless of the absence of any incorporation into the Act of a section 116—1 post-trial motion requirement, the concerns underlying that requirement in criminal appeals are also not pressing here.

Delinquency proceedings are separated into an adjudicatory stage (Ill. Rev. Stat. 1991, ch. 37, par. 805—20), which includes certain adversarial aspects and thus must satisfy due process, and a dispositional stage. (Ill. Rev. Stat. 1991, ch. 37, par. 805—22; see also *In re L.H.* (1981), 102 Ill. App. 3d 169 (Act contemplates two separate hearings: one adjudicatory, one dispositional).) The relationship between the minor and the court is open

and in the nature of *parens patriae.* (See *People v. Zepeda* (1970), 47 Ill. 2d 23, 29.) Upon a finding of delinquency, at the conclusion of the adjudicatory stage, the circuit court must set a dispositional hearing where it will be determined whether it is in the best interests of the minor and the public that he become a ward of the court. (See Ill. Rev. Stat. 1991, ch. 37, par. 805—20.) Under such scheme, even if a minor is adjudicated a delinquent, the circuit court is free to determine that he not be adjudicated a ward of the court. At the dispositional hearing, upon a determination of wardship, another best-interests determination of the appropriate disposition is then made. (See Ill. Rev. Stat. 1991, ch. 37, par. 805—22.) The purpose of this stage is for all parties to assist in developing a dispositional plan. The minor's attorney at this stage must consider and recommend what is in the minor's best interests, even if it is contrary to the minor's wishes. (*In re K.M.B.* (1984), 123 Ill. App. 3d 645.) Furthermore, while a dispositional order is considered a final judgment for purposes of appeal (see *In re A.M.* (1981), 94 Ill. App. 3d 86), it is yet subject to modification until closing and discharge of the minor (Ill. Rev. Stat. 1991, ch. 37, par. 805—23(3)) which only automatically occurs when the minor reaches 19 years of age (see Ill. Rev. Stat. 1991, ch. 37, par. 805—34(3)).

We believe that the incremental nature of this process, which for the most part is nonadversarial and designed to further the best interests of the minor, offers sufficient opportunity for the circuit court to correct itself. Furthermore, we believe the significance of any claimed errors arising from this rather uncomplicated process is more readily apparent than that of any claimed error arising within criminal process. A post-adjudicatory motion does not appear necessary to assist the circuit court, the parties or the reviewing court in the delinquency process. If anything, a post-trial motion

requirement unnecessarily adds to that process and burdens the participants. Moreover, given the purposes of the Act, we hesitate to construe it to allow for procedures more restrictive of a juvenile's right to appeal. *Cf. In re C.R.H.*, 163 Ill. 2d 263.

We determine that a section 116—1 post-trial motion requirement is not incorporated into the Act or into the delinquency appeals process, and that an adjudicated delinquent minor is not required, under the Act, to include a claim of error in a written post-adjudication motion to preserve such error for review. Accordingly, we address the merits of respondent's claim.

## II

### Waiver of *Miranda* Rights

Respondent claims that his written statement should not have been allowed into evidence because he did not validly waive his right to remain silent and the attendant right to the presence of an attorney. (See *In re Beasley* (1977), 66 Ill. 2d 385, 391 (delinquency proceedings subject to due process safeguards); see also *People v. Horton* (1970), 126 Ill. App. 2d 401, 409 (juveniles alleged to be delinquent on basis of criminal offense entitled to fifth amendment privilege against self-incrimination and to procedural safeguards established by *Miranda*).) Specifically, respondent claims that he lacked the mental capacity to understand the *Miranda* warnings he received, and thus he could not have knowingly and intelligently waived his constitutional rights.

For a defendant's confession to be admitted at trial, the State must first prove by a preponderance of the evidence that the defendant validly waived his privilege against self-incrimination and his right to counsel. (See *People v. Reid* (1990), 136 Ill. 2d 27, 56.) To be valid, the waiver must reflect an intentional relinquishment or

abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (See *People v. Bernasco* (1990), 138 Ill. 2d 349, 360 (holding, for Federal constitutional purposes, that *Miranda* waiver must be knowing and intelligent as well as voluntary).) To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail. The mental state that is necessary to validly waive *Miranda* rights involves being cognizant at all times of the State's intention to use one's statements to secure a conviction and of the fact that one can stand mute and request a lawyer. See *Bernasco*, 138 Ill. 2d at 360.

Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience, and conduct. (*Bernasco*, 138 Ill. 2d at 368.) The mental capacity of a defendant must be taken into consideration in determining whether a waiver was valid, and while mental deficiency, of itself, does not render a statement unintelligent, it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession given. (See *People v. Turner* (1973), 56 Ill. 2d 201, 206.) The greatest care must be taken to assure that a juvenile's incriminating statement was not the product of ignorance of rights or of adolescent fantasy, fright or despair. See *People v. Prude* (1977), 66 Ill. 2d 470, 476 (citing cases); *People v. Wipfler* (1977), 68 Ill. 2d 158 (included in the factors which should be considered are a defendant's age and mental capacity and special care should be taken in deciding the validity of a minor's confession).

While an accused may always " 'subjectively deny that he understood the precautionary warning[,] *** [w]hen the issue is raised in an admissibility hearing, *** it is for the court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning.' " (*People v. Reid* (1990), 136 Ill. 2d 27, 55, quoting *Coyote v. United States* (10th Cir. 1967), 380 F.2d 305, 308.) Our appellate court has held that the crucial test to be used in determining whether an accused knowingly and intelligently waived his rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear understandable warning of all of his rights. *In re Willis* (1980), 89 Ill. App. 3d 347, 358.

In reviewing a motion to suppress, a reviewing court's analysis is limited to determining whether the trial court's finding was against the manifest weight of the evidence. See *People v. Reid* (1990), 136 Ill. 2d 27, 56.

The record reveals the following. Dr. Stone testified that she administered the WISC III, the Process Assessment for Learning, the Bender Visual-Motor Gestalt, the Wide Range Achievement Test and various other tests to W.C. She also performed a clinical interview and reviewed his school records. In total, Stone estimated that she spent 28 hours with W.C. over a period of several days. W.C. scored below third grade in reading and spelling and at the beginning of third grade in math. W.C.'s vocabulary and comprehension levels were at the second-grade level. W.C., nevertheless, functioned academically at the first- to second-grade levels and was for all practical purposes illiterate. W.C.'s level of comprehension and understanding of the English language as spoken to him was on a kindergarten to first-grade level. W.C. could understand English when spoken in very short sentences with one or two syllable words.

Stone also testified that W.C.'s IQ was 47 or 48, indicating moderate mental retardation, which was the chronological age equivalent of a six- to seven-year-old. The court's psychologist agreed with this assessment. Stone believed, however, that W.C. might be able to function at a mildly retarded level, which is within an IQ range of 60 to 70. She believed his IQ score was depressed due to his being overwhelmed by and uncomprehending of his situation. In her opinion, it was fair to say that W.C. was also stressed when he was detained at the police station.

Stone testified that she also tested W.C.'s ability to read and comprehend the Dolch word list comprised of 50 words that first graders should know. W.C. was able only to comprehend concrete words such as "pretty" and "green." Based on W.C.'s performance on the test, Stone formed an opinion concerning whether W.C. would have understood the *Miranda* warnings contained in his written statement.

According to Stone, W.C. would not have understood the words "remain," "against," "during," "formal," "hire" and would absolutely not have understood the word "appointed." He would not understand the concept of "present" as meaning being there with him. He would not know the word "right" as an entitlement as opposed to being the opposite of "wrong."

According to Stone, W.C.'s ability to comprehend and think on an abstract level was extremely low. In Stone's opinion, W.C. would not have been able to understand that he had a right to remain silent during questioning and that if he gave up that right, anything he said could be used against him in a court of law. Neither would W.C., under the police questioning, have understood that he had a right to an attorney, the attorney's presence and that one could be appointed for him. For W.C., the information was too abstract. Stone

concluded that W.C. was incapable on May 30, 1992, of understanding the *Miranda* rights enumerated in his written statement and the consequences of waiving them when he spoke with police and the State's Attorney.

Police Officer Mark Mizula testified that, in 1991, W.C., aged 12 years, was taken into temporary custody by police and brought to the police station where Mizula worked. Mizula testified that he read W.C. the *Miranda* warnings, asked him whether he understood each warning, and W.C. indicated that he did. Mizula did not ask W.C. to explain what it meant to remain silent or any of the other *Miranda* warnings.

Police Officer Alfred Thome testified that, in 1990, he and his partner took W.C. into temporary custody at age 11, and Thome's partner read W.C. *Miranda* warnings from the police manual. Thome testified that W.C. stated that he understood, and when the officers asked W.C. if he wished to ask any questions, W.C. replied that he did not. At the station, Thome re-read W.C. the warnings. According to Thome, W.C. again said he understood, did not request any explanation and did not appear confused. When asked whether he wanted to answer questions, W.C. indicated that he did and answered. Thome did not ask W.C. whether he knew how to read and write or understood the meaning of various terms in the *Miranda* warnings.

Sheridan testified that in this case she advised W.C. that he did not have to talk with her if he did not want to, and that anything he told her, she would tell a judge. Sheridan also testified that she explained to W.C. that she was a lawyer and that "a lawyer is a person who helps people," but that she was "a lawyer working with the police and he could have a lawyer who helps him, who could be present, if he wanted one." Sheridan also stated that she told W.C. that if he could not afford a

lawyer, one could be "appoint[ed]" for him. According to Sheridan, W.C. responded to this information by saying either "yes" or "okay." Sheridan then asked W.C. if he wanted to tell her what had happened and he responded affirmatively.

Sheridan testified that she had no trouble communicating with W.C. and that he communicated very well and his answers were appropriate to her questions. Sheridan did not think that W.C. was moderately retarded, nor did she have any idea that his mental functioning was that of a five- or six-year-old. To Sheridan, W.C. appeared to be a normal 13-year-old who had "some" difficulty reading. W.C. never said that he did not understand his rights. Neither did W.C.'s mother ever say that she or W.C. did not understand. According to Sheridan, W.C. reflected that he understood her by his eye contact, demeanor and communication skills. Sheridan did not ask W.C. to explain what his "rights" meant.

Police Officer Joseph D. Fine testified that he read W.C. the *Miranda* warnings from the police manual before Sheridan arrived. W.C. responded affirmatively without any question, request to explain, or any statement indicating that he did not understand. Fine confirmed Sheridan's testimony regarding her interactions with W.C. Fine did not notice anything unusual about W.C. and he only learned that W.C. could not read when there was discussion regarding the reduction of his statement to writing. Fine, nonetheless, felt that W.C. was "street smart."

W.C. testified. When asked what was a public defender, W.C. answered, "Somebody that helps you." When asked what was a lawyer, W.C. responded with the query, "Somebody that will help you?" When asked what the first sentence of the *Miranda* warning meant, W.C. answered, "That I can—that I commit a crime or

something." In response to the admonishment that one has the right to talk to, have present and be appointed an attorney, W.C. replied that it meant that the "State going to give me a lawyer." When asked what the word "right," spelled "r-i-g-h-t," meant, W.C. indicated by scribbling with his right hand. When asked what he had believed a lawyer was when he was first questioned by police in this case, W.C. responded, "That they were trying to get you locked up."

The following exchange also appears of record:

"Q. And then he told you, do you understand, [W.C.], anything you say could be used against you, in a court of law, and you said yes. Right?

A. Yes.

Q. And then he told you, do you understand you have a right to have a lawyer present with you, during questioning, and you said?

A. No.

Q. You told him, no?

A. Yes.

Q. Which one of the officers did you tell that to? Could you describe him?

A. He got on glasses, I think.

Q. So you told him, no. What did you say to him when he told you that?

A. I can't hear you.

Q. You told him, 'I can't hear you', you can't hear me?

A. I can't hear you.

Q. When the officer told you, 'Do you understand you have a right to have a lawyer with you, during questioning' you told him, no?

A. I don't remember him telling me this.

Q. Do you remember him telling you, if you can't afford a lawyer, the court will appoint one for you free of charge. You can get a lawyer, free of charge.

A. No.

Q. Did you ever ask the officers to explain anything to you?

A. No; because they were explaining it to me, anyway.

Q. So you already knew and understood what they were saying?

A. Yes. They were telling me—."

For the most part, W.C.'s responses to examination consisted of either a "yes" or "no," few words, or a failure to remember. W.C.'s mother testified to basically the same account that she gave at the transfer hearing. The circuit court denied the motion to suppress.

In this case, there was no question that the evidence of the objective circumstances surrounding W.C.'s waiver supported a knowing and intelligent waiver of rights. The evidence showed that on two previous occasions W.C. had received *Miranda* warnings and had once delayed speaking with police after receiving the warnings. In this case, W.C. received at least one standard verbal *Miranda* warning, a simplified verbal explanation and was read a standard written warning. Neither W.C. nor his mother stopped the questioner, asked for explanation or indicated that W.C. did not understand. W.C. responded affirmatively in response to queries regarding whether he understood. To witnesses, his demeanor and communication skills conveyed that he understood the warnings. Notably, however, these same witnesses' evaluative observations did not detect, in the least, W.C.'s substantial intellectual limitations which are apparent from even the cold record.

There was a question, however, whether given the evidence of W.C.'s age, intelligence and mental capacities, he yet possessed *the ability* to understand the simplified warnings given by Sheridan. "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings." (*Bernasco*, 138 Ill. 2d at 363.) We agree with respondent that if one lacks that ability, the repetition of the advice even accompanied by a statement of agreement indicates very little. See *Turner*, 56 Ill. 2d at 205 (purpose of advising accused of rights is to enable an intelligent decision and an understanding of the con-

sequences of that decision, and fact that advice iterated and reiterated, and that defendant stated he understood, is of little consequence unless defendant possessed the intelligence to understand).

The evidence of W.C.'s mental ability presented at the hearing was twofold, consisting of Stone's testimony of her extensive examination of W.C., a court psychologist's summary, the social investigation report, and the testimony of W.C., himself. Stone's testimony, the summary and the report left little doubt that W.C. did not possess the ability to understand the words and terms contained in standard *Miranda* warnings, regardless of how he presented himself to the authorities. Stone testified that W.C.'s intellectual abilities and emotional development were those of a primary-school-level child. The court's own psychologist agreed. It is not so clear from this evidence, however, that W.C. would have been unable to understand Sheridan's explanation of the *Miranda* warnings.

Sheridan explained the *Miranda* warnings to W.C. in concrete, nonabstract terms: he did not have to talk; she was a lawyer, but she was a lawyer working with police, who would tell a judge what he told her; and he could have a lawyer to help him if he wanted one, even if he could not afford one. According even to the evidence detailing W.C.'s quantifiable intellectual limitations, he might have been able to understand the explanation offered by Sheridan. In this regard, as a court of review, we are not prepared to say that the trial court's firsthand assessment of W.C. was wanting. A trial court sits in a uniquely advantageous position when evaluating a witness' subjective mental capabilities. Accordingly, we conclude that the circuit court's determination that W.C.'s waiver was valid was not against the manifest weight of the evidence.

## III
### Sufficiency of Evidence

W.C. argues that the evidence was insufficient to prove him accountable for the murder of Long.

The standard of review in determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 48-49; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) The reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact (*People v. Brisbon* (1985), 106 Ill. 2d 342), and where a criminal conviction is based solely on circumstantial evidence, it will not be set aside unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Collins*, 106 Ill. 2d at 261; see also *People v. Kimball* (1993), 243 Ill. App. 3d 1096 (stating standard of review in determining sufficiency of evidence based on accountability).

The State must prove the elements of the substantive offenses alleged in delinquency petitions beyond a reasonable doubt. (See Ill. Rev. Stat. 1991, ch. 37, par. 805—18; see also *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) In establishing guilt, the State may be entitled to rely upon presumptions or inferences. (*People v. Hester* (1989), 131 Ill. 2d 91, 98.) A permissive inference, one which a fact finder is free to accept or reject, does not infringe on an accused's constitutional due process rights provided: (1) there is a rational connection between the facts proved and the facts inferred, (2) the ultimate facts more likely than not flow from the basic facts, and (3) the inference is supported by corroborating evidence of guilt. See *Hester*, 131 Ill. 2d at 99-100; *People v. Housby* (1981), 84 Ill. 2d 415.

Section 5—2(c) of the Criminal Code of 1961 defines accountability as follows:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1991, ch. 38, par. 5—2(c).

Under the provision, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. (See *People v. Taylor* (1995), 164 Ill. 2d 131, 140.) In other words, the individual must have both the mental state required for the offense, and before or during the offense he or she must aid in its commission. See *People v. Allen* (1983), 119 Ill. App. 3d 186.

To prove that the defendant possessed the intent to promote or facilitate the crime, the State may present evidence which establishes beyond a reasonable doubt that the defendant either shared the criminal intent of the principal or that there was a common criminal design. (See *People v. Stanceil* (1992), 153 Ill. 2d 218, 234-35 (citing *People v. Terry* (1984), 99 Ill. 2d 508, and *People v. Allen* (1974), 56 Ill. 2d 536).) The common-design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.

*Terry*, 99 Ill. 2d 508 (group originally conspired to commit battery, but result of their concerted acts was murder, for which all held legally accountable).

Proof of the common purpose or design need not be supported by words of agreement, but may be drawn from the circumstances surrounding the commission of an act by a group. Furthermore, the fact that the criminal acts were not committed pursuant to a preconceived plan is not a defense if the evidence indicates involvement on the part of the accused in the spontaneous acts of the group. (See *People v. Richardson* (1965), 32 Ill. 2d 472, 476-77.) Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. (*People v. J.H.* (1990), 136 Ill. 2d 1, 17.) Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself. (See *Stanceil*, 153 Ill. 2d at 237.) However, mere presence at the scene, even with knowledge that the crime is being committed, is insufficient to establish accountability for the actions of another. See *Taylor*, 164 Ill. 2d at 140; see also *People v. Thicksten* (1958), 14 Ill. 2d 132.

In the present case, evidence against W.C. was presented primarily in the form of his statement to police. In the statement, W.C. admitted that he and Juan Hodges picked up sticks and hit Long before Long was shot to death by Lucas. The statement also revealed W.C.'s knowledge of the following facts, related in sequence immediately before he admitted to the stick attack on Long: both Lucas' and Long's nicknames; that Long had taken some drugs belonging to Lucas from an abandoned building; that Lucas had a gun in the build-

ing as well and had gone to get it when he learned of the drug theft; and that Lucas had said he was going to kill Long for the theft.

Immediately after referring to the stick attack on Long, W.C. related that Lucas came out of the building, shot Long as he ran away, and fired shots at other persons. Based on the sequence of W.C.'s relation, it could reasonably be inferred that W.C.'s attack upon Long occurred just before Lucas came out of the building where he kept his gun. It could also be reasonably inferred, based on the sequence of the related facts, that W.C. both knew that Lucas had gone to get the gun and was aware of Lucas' stated intent to kill Long when he and Hodges attacked Long with the sticks. Such inferences concerning the time of these facts withstand due process scrutiny inasmuch as (1) there is a rational connection between the sequence of W.C.'s statement and the stick attack as occurring right before Lucas came out of the building with his gun; (2) it is more likely than not true based on the sequence of W.C.'s relation that the stick attack occurred right before Lucas came out of the building; and (3) there was evidence corroborating W.C.'s guilt in the form of the fact that Lucas did indeed successfully shoot Long to death in the back as he was running away after the stick attack by W.C. and Hodges. The same could be said of the inference that W.C. knew of Lucas' stated intent and move to get his gun at the time that W.C. and Hodges attacked Long. There is a rational connection between the sequence of W.C.'s statement and the inference that W.C. possessed this knowledge at the time of the stick attack, it is more likely true than not that this was so, and there was evidence corroborating W.C.'s guilt as previously mentioned. W.C.'s conduct thus constituted assistance in the commission of the murder because W.C. knew Lucas' stated intent, yet he attempted to physically impede

Long, however ineffectively, just before Long was shot to death by Lucas.

This evidence, going to the circumstances surrounding the shooting, additionally demonstrates the existence of a common criminal purpose or design. The evidence shows that, despite W.C.'s knowledge of Lucas' illegal design, W.C. voluntarily joined the design to harm Long by hitting him with a stick. W.C. was not merely present at the scene watching events unfold. W.C. and another person physically attacked Long. Also, according to W.C.'s statement, after Long was shot, he, Hodges and Lucas all ran away. W.C. did not relate what actions were taken by the two persons who were with Long. Significantly, also, when W.C. was later questioned by police, he initially gave a false version of the incident and did not relate the truthful version until his mother told him to do so. While the evidence does not support a preconceived plan between W.C. and Lucas, it nonetheless shows the devolution of a common criminal design.

This case is distinguishable from *People v. Hess* (1974), 24 Ill. App. 3d 299, cited by respondent. In *Hess*, inference alone supported proof of the key element of the crime, and other evidence—defendant and his companion asleep rather than unconscious, car lights turned off, open beer can upright on dashboard, and car in ditch alongside nonbusy township road—militated against the inference that the defendant had been driving while intoxicated. Similarly, in *People v. Ramirez* (1986), 151 Ill. App. 3d 731, *People v. Kostatinovich* (1981), 98 Ill. App. 3d 611, and *People v. Wright* (1976), 43 Ill. App. 3d 458, also cited by respondent, unlike the case at bar, there was no direct evidence that the accuseds possessed knowledge of the illegal schemes at any time. Thus, without more, evidence of their conduct alone was insufficient. Here, by contrast, there was direct evidence in the form of W.C.'s statement that he

knew of Lucas' intent to kill Long and that Lucas had gone to get a gun.

We are constrained to conclude that on this evidence, viewed in the light most favorable to the prosecution, a rational trier of fact could have found the allegations of murder by accountability in support of the delinquency adjudication beyond reasonable doubt. The circuit court's finding that W.C. was guilty of Long's murder based on accountability is not so improbable or unsatisfactory such that there remains a reasonable doubt of guilt. With respect to this issue, we affirm the judgments of both the circuit and appellate courts.

IV

Delinquency Determination and Commitment Based on Two Offenses of First Degree Murder

Respondent contends that error occurred because he was determined to be delinquent and committed to the Department of Corrections based on accountability for two first degree murders. Respondent contends that it is fundamentally unjust to allow the record to reflect that he is accountable for two murders. Respondent claims that this information in his juvenile record can adversely affect him in any future criminal or juvenile proceeding because a juvenile record can be used to aggravate an adult sentence (see 730 ILCS 5/5—5—3.2 (West Supp. 1993)) or be considered even though a delinquency finding was never entered (see *People v. Presida* (1988), 177 Ill. App. 3d 123). Respondent requests that this court vacate one of the two first degree murder counts and offenses from W.C.'s official record.

The State opposes vacation of the additional murder count or offense from the record, including the order of commitment. The State initially maintains that W.C. waived this claim by failing to raise it at the trial level by an oral objection or proper post-trial motion. Alterna-

tively, the State maintains that, unlike the case for convictions in criminal process, a finding of juvenile delinquency may be based on findings of multiple offenses arising from the same conduct. (See *In re Mareno* (1976), 43 Ill. App. 3d 556, 558 (in juvenile proceedings, unlike criminal, only a single finding of delinquency can result from multiple offenses and no prejudice results by way of violation of one-act, one-crime rule); *In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1015 (juvenile case is not criminal case and dual findings of guilt on one offense and a lesser included offense were no more than technically dual and could not result in longer commitment to Department of Corrections).) The State further maintains that any possible future adverse effect could be averted at that time by the court and parties' reliance on *Mareno*. Furthermore, the State points out that the court and parties will have the benefit of the record which adequately demonstrates that the circuit court considered the delinquency determination to be based on a merged or even a single finding of first degree murder by accountability.

Notably, the rule of waiver is a limitation on the parties and not on this reviewing court. Moreover, there is no dispute that the dispositional order, directing W.C.'s commitment to the Department of Corrections, based on two offenses of first degree murder, is incorrect. Accordingly, we determine to address the issue.

The record reflects that the trial court determined W.C. delinquent by finding two counts of first degree murder. The trial court expressly stated, however, that the two counts merged for one finding of delinquency. We agree with the State that, in this case, any possible future prejudice to W.C., resulting from the court's finding as to both murder counts, can be obviated by resort to the record, itself, showing that only one death occurred and that the court considered the two counts

merged. However, in the interests of justice and judicial economy, we believe that the dispositional order should be modified to reflect that W.C.'s commitment to the Department of Corrections was based only on a single offense of first degree murder. Such modification is in order to avoid the possibility of future confusion or adverse effect to respondent. Accordingly, that portion of the dispositional order indicating commitment to the Department of Corrections is modified to reflect that commitment was based on a single offense of first degree murder.

## CONCLUSION

We affirm the judgments of the appellate and circuit courts, but modify that part of the dispositional order pertaining to respondent's commitment to the Department of Corrections to reflect that commitment was based on one offense of first degree murder.

*Judgments affirmed as modified.*