No. 2--01--0235

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

__________________________________________________________________

PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the Circuit Court

) of Kane County.

Plaintiff-Appellee,
 ) 

)

v. ) No. 99--CF--398

   )

) 

RICKEY L. QUEZADA, ) Honorable

) 
Philip L. DiMarzio,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, Rickey Quezada, of first-degree murder (720 ILCS 5/9--1(a)(1) (West 1998)).  The circuit court of Kane County sentenced defendant to 45 years in prison.  Defendant argues on appeal that (1) the trial court erred in denying his motion to suppress his confession; and (2) he received ineffective assistance of counsel.

BACKGROUND

On February 11, 1999, 14-year-old Hugo Rodriguez was shot and killed in a classroom at Ombudsman Educational Services in Elgin, the school that both he and defendant attended.  Defendant, who was 15 years old, was arrested for Rodriguez's murder on February 16, 1999, in Wheeling.  After being taken to the Elgin police station, defendant made a taped statement in which he confessed to shooting Rodriguez.  Prior to trial, defendant filed a motion to suppress in which he contended that his confession was not voluntary because the police failed to immediately notify his parents of his arrest and the youth officer assigned to him did not adequately protect his interests. 

A. Evidence Relating to Defendant's Confession

At the hearing on defendant's motion to suppress, several Elgin police officers testified about contacts they had with defendant prior to his arrest for Rodriguez's murder.  Officer Thomas Clancy testified that he arrested defendant on March 30, 1998, for unlawful use of a weapon.  When defendant was asked for the phone number of one of his parents, he provided his father's phone number.  Officer Sean Rafferty interviewed defendant in connection with the March 30 arrest.  At that time, Rafferty advised defendant of his 
Miranda
 rights and his right to have a parent with him during questioning.  Defendant's father, Nicholas Quezada (Nicholas), came to the station but was not present during defendant's interrogation.

Officer Jeffrey Adam testified that on June 22, 1998, he had contact with defendant regarding a probation violation.  At that time, defendant indicated that he was living with his father.  Adam arrested defendant on October 13, 1998, for unlawful possession of cannabis.  Defendant told Adam then that he lived with his mother.

Four Elgin police officers testified regarding the events of February 16, 1999.  Detective Jesse Padron testified that, in the late morning of February 16, 1999, he and Detective Chris Troiola went to the home of defendant's mother, Carolyn Quezada (Carolyn), to see if she had any information as to defendant's whereabouts.  Carolyn did not know where defendant was and had not seen him for the past five days.  She indicated that defendant lived with her but  went back and forth between her residence and his father's residence.

Later that day, Padron and several other detectives went to an apartment complex in Wheeling where they found defendant and arrested him at 9:57 p.m.  One of the detectives, James Lullo, was a juvenile officer.  Troiola asked Lullo to accompany him and the other detectives to act as defendant's juvenile officer.  Upon defendant's arrest, Lullo advised him that he was a juvenile officer and that if defendant had any questions he should ask him.  Padron, Troiola, and Lullo drove defendant back to Elgin.  When they were in the squad car, Troiola advised defendant that they had a murder warrant for him.  Padron told defendant that he was going to be tried as an adult and that this was a very serious case.  He also told defendant that they would talk to him about the charges when they got to the police station.  Padron testified that they did not discuss the case during the ride back to Elgin.  Defendant's demeanor was calm during this time.

The detectives and defendant arrived at the Elgin police station sometime before 11 p.m.  Padron and Lullo accompanied defendant to the interview room.  Lullo advised defendant that he was a juvenile officer and would be present during the interview.  Lullo told defendant that he needed to contact defendant's legal guardian.  Defendant told Lullo to call his father.  Lullo asked another detective, Leigh Rawson, to contact defendant's father.

Approximately 10 to 15 minutes after Rawson called defendant's father, Lullo read defendant his 
Miranda
 rights and the interview began.  Detective Troiola was also present for the interview.  Padron stated that he interviewed defendant for approximately 15 minutes before they began taping.  Neither of defendant's parents came to the police department during the interview process.

Padron described the interview as normal, calm, and nonconfrontational.  Defendant was easygoing and calm.  When the officers asked defendant a question he did not want to answer, defendant told the officers that he did not wish to answer the question.  When the interview was over, defendant asked the officers to play back the tape so he could hear it.

On cross-examination, Padron testified that when he spoke to defendant's mother she told him that defendant lived with her but  that he also stayed with his father.  Padron further testified that prior to the interview Lullo told him that defendant's father had been contacted and said he was not coming to the station.  Padron did not tell defendant that his father was not coming.  He did not know whether Lullo so advised defendant. In the recorded interview,  defendant acknowledged that he had been advised of his 
Miranda
 rights and his right to have his mother present and had agreed to speak to the officers without his mother or an attorney being present. 

Rawson testified that he called defendant's father, Nicholas, at Lullo's request.  A "younger female" answered the phone.  After Rawson identified himself and asked for Nicholas, another female got on the phone and asked what he wanted.  Nicholas then got on the phone and Rawson advised him that defendant was at the Elgin police department on a murder warrant.  Nicholas asked whether defendant turned himself in and where the police found him.  Rawson told Nicholas that he had the right to come to the station and speak to defendant.  Nicholas said, "Thank you, officer," and hung up the phone.  Rawson then told Lullo that he had notified defendant's father, and it did not sound like he was coming to the station.

Rawson testified that he is a juvenile officer.  The Elgin police department's procedure with respect to notifying a juvenile's parents was to contact a parent as soon as possible after arriving at any facility with a juvenile in custody.  Rawson testified that he called defendant's father at approximately 10:55 p.m.

Detective Troiola testified that, prior to defendant's arrest, the police did not have a clear understanding as to where defendant lived.  They had some reports that he lived with his father and others that he lived with his mother.  

Troiola testified that defendant was arrested at 9:57 p.m.  The ride from Wheeling to Elgin took approximately 30 to 40 minutes.  Defendant appeared unconcerned about his situation.  He never cried or appeared nervous.  Troiola's version of the events surrounding defendant's arrest and interview was substantially the same as that of Detective Padron.  Troiola recalled that Detective Lullo read defendant his 
Miranda
 rights from a printed card and added at the end that defendant had the right to have one or both of his parents present while he was being questioned.  Defendant waived those rights in Troiola's presence.  Troiola testified that after the interview was over defendant asked him to play back portions of the tape.  Defendant indicated that he wanted to make sure he did not say anything that would inculpate his friends.

Detective Lullo testified that, when acting in his capacity as a juvenile officer, his duties in an interview situation are to protect the juvenile's rights, make sure he is protected from any undue physical harm or emotional stress, and explain the proceedings, if necessary.  Lullo stated that, after arriving at the police station with defendant, he asked defendant for the name of his "legal responsible parent."  Defendant said, "Call my dad," and gave Lullo his father's phone number.  Later, Lullo told defendant that his father had been notified of his arrest, but he did not know whether defendant's father was coming to the station.  

When Padron and Troiola came into the interview room, Lullo told defendant that they were the case investigators and, if defendant did not understand anything they asked him, he should ask Lullo to rephrase the question.  Lullo also told him that he would advise him of his 
Miranda
 rights.  Lullo read defendant his 
Miranda
 rights from a printed card.  In addition, he told defendant that he had the right to have a parent or guardian present during questioning.  Defendant said that he understood all of his rights and wanted to waive them.  Lullo stated that the untaped portion of the interview lasted approximately one hour.  They took a break and returned for the taped interview.  Defendant was confident and calm during the interview.  When defendant told the officers that he did not want to answer certain questions, the officers did not press him to answer them.

On cross-examination, Lullo testified that he also assisted in the interview by asking specific questions related to defendant's gang involvement.  Lullo did so because the other detectives conducting the interview did not know a lot about gangs.  Lullo is a gang specialist who has been qualified as an expert to testify in court about gang activity.  When Lullo began questioning defendant, he had already confessed to his involvement in the murder.

Defendant called his mother, Carolyn, as his first witness.  She testified that, when the police visited her home prior to defendant's arrest, she gave them her home and work phone numbers.  However, the police did not call her after they arrested defendant.  Sometime during the late evening of February 16 or early morning of February 17, Carolyn received a phone call at work from her daughter, Tina, who told her that defendant had been arrested.  Carolyn went home and called the Elgin police department.  She testified that she spoke to the officer who arrested defendant and asked him if she could talk to defendant.  The officer told her that defendant had been transferred to St. Charles.

Carolyn further testified that defendant was in special education programs when he was in elementary school.  According to defendant's most recent progress report, he was reading at a sixth-grade level.  Carolyn stated that she would always have to repeat herself when she gave defendant directions.  

On cross-examination, Carolyn acknowledged that although she had physical custody of defendant he had lived with his father for several periods over the years and had regular communication with him.  According to defendant's last progress report, he was making satisfactory progress in all of his school subjects.

Defendant's sister, Maria Veronica Quezada (Maria), testified that she was living with her father, Nicholas, at the time defendant was arrested.  She answered the phone call from the Elgin police department.  According to her, it was after 11 p.m. when the call came.  Her father was sleeping at the time.  The officer asked to speak to "Nick."  Maria woke up her father and gave him the phone.  After Nicholas hung up the phone, Maria asked him if he was going to the police station.  He replied that he was not, because defendant had already been taken somewhere else.  Maria testified that she then told her sister, Tina, to call their mother and tell her "that they had Rickey, for her to go down there."

Nicholas testified that he could not recall the name of the officer who called him.  The officer said that his son was in custody.  Nicholas asked him where they found defendant.  The officer told him that defendant was charged with murder.  Nicholas did not recall the officer telling him that he had the right to be with his son at the police station.  He never said that he was not coming to the station.  When asked why he did not go to the police station, Nicholas answered, "I really don't remember, but when they called me, it was about 11:30 or quarter to 12:00, and they really didn't say, you know, come to the police station, all they said is they had my son in custody." 

Following the hearing, the court found that defendant's father was notified in a timely manner.  The court noted that the officers probably should have contacted defendant's mother as well, but, under the circumstances, the officers complied with the law.  The court further found that the interview was calm and nonconfrontational and that defendant was not threatened or subjected to coercive tactics.  The court did rule, however, that Detective Lullo's questioning of defendant should be viewed with heightened scrutiny because of his position as a youth officer who was supposed to be protecting defendant's interests.  Consequently, the court granted the motion to suppress with respect to defendant's responses to Lullo's questions regarding gang involvement, but denied the motion to suppress as to the remainder of defendant's statements.

B. Trial

In her opening statement, defense counsel did not present a theory as to why the jury should find defendant not guilty.  Rather, she said, "When I get up at the end of the evidence, * * * I will give you an explanation as to why I believe you should find Rickey Quezada not guilty, and I ask you in that regard, although you don't have that explanation yet because I can't give it to you yet, to listen carefully to his statement, the statement he gave to the police when he was arrested on this offense."

The State's first witness, Tommilyn Grady, testified that she is a teacher at Ombudsman Educational Services in Elgin, which is an alternative education program.  They had a morning session and an afternoon session.  The victim and defendant were students in the afternoon session.  Defendant was not present when class began on the date of the shooting.

At approximately 12:25 p.m., a person walked through the classroom door and began firing a gun.  Grady described the person as male, approximately 5 feet 10 inches to 6 feet tall, with a medium to stocky build.  The individual wore a navy blue sweatshirt with the hood pulled up, dark pants, and a bandana over his face.  The shooter stood three or four feet from Rodriguez, who was seated at his desk, and fired five or six shots at him.  After the initial shot, Rodriguez attempted to move away but the shooter continued to fire at him. 

Grady described defendant's appearance as "medium to tall in height and stocky build, dark complexion and hair."  She testified that the shooter rolled his shoulder when he walked, which was similar to the way she had seen defendant walk.  Grady stated that she was able to see the eye area of the shooter's face.  His eyes were dark and his skin was dark.  The person was not African-American.  On cross-examination, Grady testified that she saw the first three shots fired, and then got under her desk.  

Robert Piercy testified that he was a teacher at Ombudsman Educational Services on the day of the shooting.  At the time the shooter entered the classroom, Piercy was seated at his desk on the opposite side of the room from the doorway.  Piercy described the shooter as a male, 5 feet 7 inches to 5 feet 8 inches tall, and weighing about 190 pounds.  He wore a blue hooded sweatshirt, blue sweat pants, and a blue bandana over his face.  Piercy saw the shooter point his gun at Rodriguez and start shooting.  Rodriguez stood up and attempted to move away.  Piercy ducked underneath his desk.  He heard six or seven gunshots in total.  After the shooting, he got out from underneath the desk and saw through the window the form of a person running toward the west.  

On cross-examination, Piercy stated that he could not determine the race of the shooter.  He did not see the last two shots fired.  He did not recognize the shooter.

The police recovered a blue bandana from a yard near the school.

They also collected seven .45-caliber spent shell casings inside the school room and four fired copper-jacketed bullets.  Three fired copper-jacketed bullets were recovered from the victim's body.  The victim did not have any weapons on his person.  

Forensic scientist Russell McLain testified that the bullets and casings recovered from the scene were consistent with being fired from a Glock .45-caliber firearm.

Dr. Brian Mitchell testified that he performed the autopsy on the victim.  He had seven entrance wounds in his head, back, buttocks, and arm.  The shot to the victim's head was fired at close range.  On cross-examination, Dr. Mitchell testified that the victim had a monitor bracelet attached to his ankle.

Irma Hernandez testified that she lives at 561 North Weston Avenue in Elgin, which is near Ombudsman Educational Services.  On the date of the shooting at approximately 12:15 p.m., she was looking out her kitchen window and saw a young person walking in the street.  He turned toward her house and went across her driveway.  She went outside and yelled at him, "Why are you going through my driveway?"  Hernandez identified the person she saw as defendant.  Later that day, a police officer came to her house and she identified a photograph of defendant.

On cross-examination, Hernandez testified that when she went outside her house she only saw defendant from the back.  He was wearing a baseball cap and was 5 feet or 5 feet 6 inches tall.

Forensic scientist Julie Glasner, an expert in DNA analysis, testified that she tested DNA material taken from the blue bandana recovered by the police against defendant's blood sample and concluded that there was a mixture of DNA from at least three individuals on the bandana.  Defendant could not be excluded as a possible contributor for the particular stain.  She further concluded that approximately one in five black individuals, one in four Hispanic individuals, and one in five white individuals could not be excluded as contributors.  On cross-examination, Glasner conceded that she did not have the ability to point to the specific person who contributed to the stain.  

Detective Jeffrey Adam of the Elgin police department testified as an expert on the subject of street gangs.  Adam testified that defendant was a member of the Spanish Gangster Disciples.  The victim was a member of a rival gang, the Insane Deuces.  Adam further testified that the date of the shooting, February 11, was known as "Deuce Killer Day."  On cross-examination, Adam testified that he had arrested the victim twice for unlawful use of a weapon.

Joseph Bobak testified that he manages a gun shop in Carpentersville.  The day after the shooting, two Hispanic individuals came into the shop.  One of the individuals, whom Bobak identified as defendant, wore a black leather jacket.  He wanted to look at a Glock handgun.  Bobak denied his request to see the gun.

Detective Lullo testified regarding defendant's arrest and subsequent interview.  Lullo's testimony in this regard was substantially the same as that which he gave in the suppression hearing.   In addition, he testified that defendant related during  questioning that, three days before the shooting, the victim had told defendant that "he was coming for him."  Defendant interpreted this to mean that the victim planned to do him harm.  Defendant said that he used a .45-caliber Glock to shoot the victim and that he had fired approximately seven rounds.  After the shooting, defendant ran through some back yards and got into a friend's red car.  Defendant stated that he took the gun he used to Navy Pier and threw it in Lake Michigan.  He further stated that he had been wearing a baseball cap but it had blown off of his head while he was running.

In his taped statement, which was entered into evidence and played for the jury, defendant confessed to firing seven rounds at the victim with a Glock .45 handgun.  He also admitted to being a member of the Spanish Gangster Disciples.  He believed that the victim was "a Deuce."  After the victim told defendant, "I'm coming," defendant believed his life was in danger.  He believed the victim had seen the tattoos on defendant's arm and therefore knew defendant belonged to a gang.  

Defendant called his mother as his first witness.  She testified that she had never seen defendant wear a black leather jacket.  As far as she knew, he had never owned a black leather jacket.

Detective Adam testified that he arrested the victim on December 30, 1997, for the unlawful possession of a weapon, armed violence, and the unlawful possession of a controlled substance.  On October 6, 1998, he arrested the victim again for the unlawful use of a weapon.

In her closing argument, defense counsel asked the jury to find defendant guilty of second-degree murder instead of first-degree murder, because he had acted in self defense.  The jury convicted defendant of one count of first-degree murder.  Defendant filed a motion for a new trial, which the court denied.  The court sentenced defendant to 45 years in prison and denied defendant's motion to reconsider sentence.

ANALYSIS

Defendant's first argument on appeal is that the trial court erroneously denied his motion to suppress the statements he made to police following his arrest.  Defendant contends that his confession was not voluntary and his waiver of his 
Miranda
 rights was not knowingly and intelligently made.  Defendant bases his argument on the following grounds: following defendant's arrest, the Elgin police department did not immediately contact his father and did not contact his mother at all; and Detective Lullo, the youth officer assigned to defendant, failed to fully advise defendant of his rights and interrogated him during questioning rather than protecting his interests.

In 
In re G.O.
, 191 Ill. 2d 37, 50 (2000), our supreme court enunciated a two-step approach for reviewing a trial court's determination that a confession was voluntary.  First, the reviewing court determines whether any of the trial court's factual findings are at issue.  If the defendant challenges the trial court's findings of fact, the reviewing court gives those findings great deference and will reverse them only if they are against the manifest weight of the evidence.  
G.O.
, 191 Ill. 2d at 50.  Second, the reviewing court applies a 
de novo
 standard of review to the ultimate legal question of whether the confession was voluntary.  
G.O.
, 191 Ill. 2d at 50.  When neither the facts nor the credibility of the witnesses is at issue, the reviewing court conducts a strictly 
de novo
 review.  
People v. McDaniel
, 326 Ill. App. 3d 771, 780 (2001).

When determining whether a confession was voluntary, we must decide whether the defendant "made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed."  
People v. Gilliam
, 172 Ill. 2d 484, 500 (1996).  We must look at the totality of the circumstances, including the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises.  
G.O.
, 191 Ill. 2d at 54.  No single factor is dispositive.  
G.O.
, 191 Ill. 2d at 54.

The supreme court has characterized the taking of a juvenile's confession as a "sensitive concern" (
People v. Prude
, 66 Ill. 2d 470, 476 (1977)), in which the court must take great care to assure that the confession was neither coerced nor " 'the product of ignorance of rights or of adolescent fantasy, fright or despair.' "  
People v. Simmons
, 60 Ill. 2d 173, 180 (1975), quoting 
In re Gault
, 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458 (1967).  This concern has generated an additional factor for courts to consider, namely, whether the juvenile had an opportunity to consult with a concerned adult interested in his welfare either before or during the interrogation.  
G.O.
, 191 Ill. 2d at 55.  In addition, section 5--405 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5--405 (West 2000)) requires a law enforcement officer who arrests a minor to "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where he or she is being held."

Following the suppression hearing in this case, the trial court  made the following findings of fact.  After defendant's arrest in Wheeling, he and the arresting officers arrived at the Elgin police station at approximately 11 p.m.  Detective Lullo, the youth officer, was present during the ride to the police station and while at the station.  When Lullo asked defendant the name of his "legal responsible parent," defendant instructed him to call his father and gave him a phone number to call.  Detective Rawson called the number and gave defendant's father the basic information regarding his son. Defendant's father asked a couple of questions, then hung up the phone.  Rawson interpreted the father's response to mean that he was not coming to the station.  Lullo told defendant that his father had been notified and he did not know whether his father was coming to the station.  Defendant was advised of his rights in an adequate manner considering his age, educational level, and experience with the police and the court.  Defendant's responses indicated that he understood his rights and chose to waive them.  The court further found that the tone of the interview was calm and nonconfrontational.  Defendant was not deprived of any necessities, nor did the police threaten him or make him any promises.  The court did not find credible the testimony of defendant's sister to the effect that defendant's father said that he was not going to the station because defendant had already been taken elsewhere.  

The only factual finding defendant appears to challenge is the trial court's determination that defendant possessed the mental capacity necessary to understand his rights and what it meant to waive them.  While the court did not specifically address this issue, it found that defendant understood his rights and chose to waive them.  Implicit in that finding is that defendant possessed sufficient mental capacity to comprehend his rights and the concept of waiver.  

Relying on the facts that he had been a special education student while in elementary school and only read at a sixth-grade level at the time of his confession, defendant challenges the court's finding.  However, nowhere in the record is there any evidence to suggest that defendant actually was incapable of understanding his 
Miranda
 rights as explained to him by Detective Lullo.  Moreover, defendant's inability to read above a sixth-grade level does not mean that he could not understand Lullo's oral explanation of his rights.  Similarly, the fact that defendant had been enrolled in special education classes in elementary school does not inescapably lead to the conclusion that, at age 15, he could not understand his rights.  By all indications, defendant comprehended what the police told him regarding his 
Miranda
 rights and his decision whether to waive those rights.  Accordingly, the trial court's finding that defendant understood his rights was not contrary to the manifest weight of the evidence.

Next, we consider the ultimate question of whether defendant's confession was voluntary considering the totality of the circumstances.  Defendant contends, in part, that his confession was not voluntary because the arresting officer did not contact one of his parents immediately after his arrest but instead waited until defendant had been transported from Wheeling to the Elgin police station, approximately one hour after the arrest.  

Section 5--405 requires a law enforcement officer who arrests a minor with a warrant to "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where he or she is being held."  705 ILCS 405/5--405 (West 1998).  Our research has revealed no case law addressing the "immediate notification" requirement.  We agree with defendant that, by waiting one hour after his arrest to notify his father, the police did not satisfy the requirements of section 5--405.  

In this context, "immediately" means "without interval of time," or "without delay."  Webster's Third New International Dictionary 1129 (1993).  The purpose of requiring officers to immediately make a reasonable attempt to notify a concerned adult of a juvenile's arrest is "to allow, where possible, the concerned adult to confer and counsel with the juvenile 
before
 interrogation and confession."  (Emphasis in original.)  
People v. Montanez
, 273 Ill. App. 3d 844, 850 (1995).  Here, the police waited approximately one hour from the time they arrested defendant before calling his father.  Under the circumstances of this case, we cannot say that the police notified defendant's father "without delay."  Nothing prevented the arresting officers from calling the station while they were en route and asking one of their fellow officers to contact defendant's father.  This would have given defendant's father the opportunity to come to the station and speak with his son prior to his interrogation and confession.  The fact that he chose not to do so does not affect the arresting officers' obligation to comply with the statute's notification requirement. 

Contrary to the State's argument, the fact that the arresting officers refrained from questioning defendant during the ride to Elgin does not remedy the failure to immediately notify one of defendant's parents. Even though the Elgin police took steps to protect defendant's rights, we must emphasize the importance of strictly complying with section 5--405.  The police do not have the same concern for a juvenile's welfare that a parent or other legally responsible adult would have.  Moreover, under the State's position, the police could hold a juvenile indefinitely without notifying a parent of his arrest so long as they did not question the juvenile.  Such a situation would clearly violate the intent of section 5--405.

Our holding that the Elgin police violated section 5--405 by waiting one hour after defendant's arrest to notify his father should not be construed to mean that the passage of one hour between a juvenile's arrest and the attempt to notify a parent will always constitute a violation of section 5--405.  There could be scenarios in which the circumstances would prevent the police from being able to immediately notify a juvenile's parents.  This is not such a situation, however.  We cannot consider the Elgin police department's notification of defendant's father to have been "immediate" when ample opportunity existed to notify him earlier. 

    That being said, the failure to immediately notify defendant's father of the arrest does not render the confession inadmissible.  See 
G.O.
, 191 Ill. 2d at 55.  It is well established that noncompliance with section 5--405 is but one factor for the court to consider when looking at the totality of the circumstances.  
G.O.
, 191 Ill. 2d at 55.  We have examined the totality of the circumstances and conclude that defendant's confession was voluntary.  He was informed of his constitutional rights and indicated that he understood them.  He had been arrested before and thus had experience dealing with the police.  He was not under any sort of duress prior to or during his  questioning.  A youth officer was with defendant at all relevant times and had advised him to ask for an explanation if he did not understand anything he was told.  There was no indication that defendant's confession had been coerced or that his will had been overcome in any way.

We reject defendant's arguments that the failure to notify his mother and Detective Lullo's participation in the interrogation tainted his confession.  Section 5--405 does not require the police to notify both parents (705 ILCS 405/5--405(1) (West 1998)) and we will not expand the scope of the statute by reading such a requirement into it.  With respect to Detective Lullo, who was acting as a youth officer, we agree with the trial court that it is problematic when an officer who is supposed to protect a juvenile's rights participates in the interrogation by asking the juvenile for potentially incriminating information.  The safer course of action would be for the youth officer to refrain from asking the juvenile any questions about the offense for which the juvenile was arrested.  Here, however, the trial court cured any problem by granting the motion to suppress as to any statements defendant made in response to Detective Lullo's questions.  

Relying on the same arguments, defendant also contends that he did not knowingly and intelligently waive his constitutional rights.  Whether a minor knowingly and intelligently waives his or her rights depends on the facts and circumstances of the particular case, including the minor's age, background, experience, and conduct.  
In re W.C.
, 167 Ill. 2d 307, 328 (1995).  The court must consider the minor's mental capacity, but evidence of mental deficiency alone does not render a statement unintelligent.  
W.C.
, 167 Ill. 2d at 328.  

In the case before us, the evidence showed that defendant had been enrolled in special education classes when he was in elementary school.  At the time of the shooting, he was enrolled in an alternative education program.  In 1998, the year before the shooting, defendant was earning As and Bs in his classes.  His most recent progress report indicated that he was making satisfactory progress at school and was reading at a sixth-grade level.  Detective Lullo testified that defendant had no difficulty communicating with the officers and he understood everything that occurred.  Lullo explained all of defendant's rights to him and asked him if he understood each right.  There was no evidence whatsoever that defendant did not understand the explanation of his rights or the concept of waiver.  He was not under the influence of drugs or alcohol at the time of his questioning.  In addition, defendant had been arrested before and had experience dealing with the police.  He took special care not to implicate anyone but himself in the crime, refusing to answer certain questions and asking to hear the tape after he had finished his statement.  Defendant thus displayed a familiarity with and a certain degree of control over the interrogation process that belie his assertion that he was incapable of making a knowing and intelligent waiver.  For all of these reasons, we conclude that defendant's waiver of his constitutional rights was both knowing and intelligent.

Defendant's next contention is that he did not receive the  effective assistance of counsel.  Defendant asserts that (1) remarks his counsel made during her opening statement were prejudicial to him, (2) his attorney did not present a cohesive defense, (3) his attorney  failed to object to testimony that the date of the shooting was "Deuce Killer Day," and (4) his attorney failed to object to evidence regarding defendant's refusal to answer questions during his taped statement.

A defendant who alleges the ineffective assistance of counsel must satisfy both prongs of the two-part test enunciated by the Supreme Court.
  The defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) he was prejudiced by his counsel's errors.  
Strickland v. Washington
, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984);  
People v. Albanese
, 104 Ill. 2d 504, 525-26 (1984).  In order to demonstrate prejudice, a defendant must establish that there was a reasonable probability that the result of the proceeding would have been different but for counsel's errors.  
Strickland
, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; 
Albanese
, 104 Ill. 2d at 525.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; 
Albanese
, 104 Ill. 2d at 527.

Here, we need not analyze defense counsel's performance because the evidence of defendant's guilt was overwhelming.  The shooting took place in the school that both defendant and the victim attended.  Defendant did not attend class on the day of the shooting.  Defendant's teachers testified that the shooter's gait and build resembled those of defendant.  Irma Hernandez placed defendant in the neighborhood of the school shortly after the shooting took place.  Detective Adam, an expert on gangs, testified that defendant and the victim were members of rival gangs.  Officers Lullo and Troiola testified that defendant confessed to them that he had killed Rodriguez.  Most importantly, defendant made a taped confession in which he admitted to entering the school with his face covered and shooting Rodriguez seven times with a Glock .45-caliber handgun.

Defendant's argument that his counsel's errors diminished the  strength of his self-defense theory is not persuasive.  The only evidence defendant presented on this defense was that the victim had earlier been arrested for unlawful possession of a weapon and, three days before the shooting, had said to defendant, "I'm coming for you."  A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.  720 ILCS 5/7--1 (West 1998).  A person is justified in using force that is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.  720 ILCS 5/7--1 (West 1998).  In the present case, there was absolutely no evidence that would have  allowed the jury to conclude that defendant reasonably believed he was in danger of imminent death or great bodily harm from the victim, who was unarmed and seated in a classroom when defendant shot him seven times.  Consequently, even assuming 
arguendo
 that defense counsel committed the errors of which defendant complains, there was no reasonable probability that the outcome of the trial would have been different but for those errors.

Accordingly, we affirm the judgment of the circuit court of Kane County. 

Affirmed.

HUTCHINSON, P.J., and GEIGER, J., concur.