No. 2--02--1218

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Kane County.

)

Plaintiff-Appellee, ) 

)

v. ) No. 01--CF--390

)

MARCELINO GONZALEZ, ) Honorable

) Philip L. DiMarzio,

Defendant-Appellant. ) Judge, Presiding.

______________________________________________________________________________

JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Kane County, defendant, Marcelino Gonzalez, was convicted of one count of attempt (first-degree murder) (720 ILCS 5/8--4(a), 9--1(a)(1) (West 1998)), four counts of aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 1998)), and five counts of aggravated discharge of a firearm (720 ILCS 5/24--1.2(a)(2) (West 1998)).  The trial court merged defendant's convictions of aggravated discharge of a firearm into his other convictions.  The court sentenced defendant to consecutive terms ranging from six to nine years on each of the four convictions of aggravated battery with a firearm and a term of 14 years' imprisonment on the attempt conviction.  The court ordered the sentence for attempt to run concurrently to the sentences for aggravated battery with a firearm.  On appeal, defendant argues that the trial court erred in denying his pretrial motion to suppress his confession.  Alternatively, defendant contends that the sentences imposed on his convictions of aggravated battery with a firearm should be modified to run concurrently because there was no evidence that the victims suffered severe bodily injury.  We affirm.

I.  BACKGROUND

On July 2, 1998, at approximately 7:40 p.m., a shooting occurred at Copley One Park in Aurora.  Justin Cavazos, Samuel Perez, Guillermo Pacheco, and Sergio Castellanos were wounded in the shooting.  Shortly after the incident, defendant was apprehended.  After being taken to the Aurora police department, defendant made a taped statement in which he confessed to participating in the shooting.  Defendant was approximately 16 years 10 months old at the time of the offense.  Following a hearing, defendant's case was transferred from juvenile court to the adult division of the criminal court for prosecution.

Prior to trial, defendant filed a motion to suppress his statement.  In the motion, defendant asserted that the statement he made to the police was not voluntarily, knowingly, and intelligently made because the officers who questioned him never (1) contacted his parents; (2) inquired into his educational background or 
mental capacity; (3) employed the use of a juvenile officer; or (4) made any other attempts to treat defendant differently than an adult suspect.  A hearing on the motion commenced on January 16, 2002, at which the following evidence was adduced.

Officer Jeffrey Sauer of the Aurora police department testified that at approximately 10:33 p.m. on July 2, 1998, he interviewed defendant in connection with the shooting.  The interview took place in an interview room of the special operations unit of the Aurora police department.  The room was fitted with equipment used to make video and audio recordings.  Because defendant was only 16 years old, Investigator Robert Downs, a certified juvenile officer, was also present. 

After Sauer obtained defendant's consent to record the interview, Downs asked defendant whether he understood and read English.  Defendant informed Downs that he had some problems reading English.  Downs then read defendant his 
Miranda
 rights from a preprinted form.  After reading each of the five enumerated rights, Downs asked defendant whether he understood them.  Defendant responded in the affirmative.  Downs then gave defendant the form, which provided:

"
RIGHTS OF THE ACCUSED

YOU HAVE THE RIGHT TO REMAIN SILENT[.]

ANYTHING THAT YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW.

YOU HAVE THE RIGHT TO TALK TO A LAWYER AND HAVE HIM PRESENT WITH YOU WHILE YOU ARE BEING QUESTIONED.

IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE APPOINTED TO REPRESENT YOU BEFORE ANY QUESTIONING, IF YOU WISH.

YOU CAN DECIDE AT ANYTIME TO EXERCISE THESE RIGHTS AND NOT ANSWER ANY QUESTIONS OR MAKE ANY STATEMENTS.

WAIVER OF RIGHTS

I HAVE HAD THE ABOVE RIGHTS EXPLAINED TO ME[,] 
AND I UNDERSTAND WHAT MY RIGHTS ARE.

NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND I AM WILLING TO ANSWER QUESTIONS.

SIGNATURE: ____________________________

WITNESSED BY _________________________

WITNESSED BY _________________________

DATE: __________________________________ TIME: ______________

PLACE: _______________________________________________________"

Downs instructed defendant to read aloud the first sentence under the heading "Rights of the Accused" and to place his initials beside the statement if he understood it.  Defendant complied.  Downs then told defendant to read each of the four remaining rights to himself and to place his initials next to each line as an indication that he understood it.  Defendant appeared to read each line and, after the passage of some time, he initialed each line in the margin.

Downs then instructed defendant to read the two statements under the heading "Waiver of Rights" and to initial the statements if he understood them.  Sauer observed defendant read the lines and initial them.  Downs then asked defendant to place his name on the signature line if he wanted to waive his rights and talk to the officers.  Defendant printed his name on the signature line.  Downs and Sauer signed the form as witnesses.  Sauer testified that defendant never asked any questions during the course of the procedure and that defendant did not indicate that he did not understand his rights.  After defendant read and signed the form, he agreed to speak with Sauer and Downs.  Sauer estimated that the interview with defendant lasted 20 minutes.  Sauer added that defendant was not handcuffed during the interview, neither he nor Downs was armed, and neither he nor Downs threatened defendant or made any promises to him during the interview or prior to informing defendant of his
 rights.

Sauer offered that he did not notify defendant's parents of the arrest because Sauer was "under the impression that either Investigator Downs, booking, or another investigator had already done it."  Sauer further offered that, during the course of the interview, defendant never asked to speak to his parents and that he (Sauer) was never told that defendant's parents were at the police station to speak with defendant.  Moreover, defendant never told the officers that he did not wish to speak with them.  On cross-examination, Sauer acknowledged that when he (Sauer) entered the interview room, defendant may have asked, "Did you guys call my parents yet?"

Investigator Downs testified next and generally corroborated Sauer's testimony.  
On cross-examination, Downs explained that a juvenile officer's duties include ensuring that the juvenile is read his or her rights and that he or she understands them.  Downs testified that his approach toward defendant differed from the one he takes with adults in that he asked defendant if he understood each of the individual rights.  Downs admitted, however, that he did not ask defendant to paraphrase each right to ensure defendant's understanding and that he did not read the waiver-of-rights provision to defendant.  Finally, Downs admitted that he did not call defendant's parents before the interview.

Diane Sanchez-Podschweit testified that she is a juvenile officer with the Aurora police department.  Sanchez-Podschweit explained that in advising juveniles of their rights, she reads each right out loud from the preprinted form, asks the juvenile whether he or she understands each right, and tells the juvenile that if he or she does not understand she will explain each right to him or her.  With respect to the waiver-of-rights provision of the form, Sanchez-Podschweit stated that she has the juvenile read the two statements out loud.  She then asks the juvenile if he or she understands the waiver.  If the juvenile answers in the affirmative, Sanchez-Podschweit has the juvenile initial the statements.  If the juvenile does not understand, Sanchez-Podschweit explains the waiver.

Sanchez-Podschweit testified that in 1997, she gave defendant 
Miranda
 warnings in connection with a residential burglary investigation.  Officer Kip Rose of the Aurora police department was also present.  At the time, defendant told her that he understood his rights when they were read to him.  Defendant did not ask for an explanation of any of the rights.  In addition, defendant read aloud the two statements in the waiver provision, he initialed them, and he signed the form in Sanchez-Podschweit's presence.  Sanchez-Podschweit did not recall defendant ever asking for an explanation of the waiver.  On cross-examination, Sanchez-Podschweit acknowledged that the entire recollection of her encounter with defendant was from a police report.  Further, she stated that she could not recall whether defendant had any difficulty reading the waiver provision.

Alexandra Tsang testified on defendant's behalf.  Tsang holds a doctorate in clinical psychology and is a staff psychologist at the Kane County Diagnostic Center.  Tsang never met defendant.  However, she had reviewed records of a psychological evaluation that defendant underwent in 1998.  Tsang testified that defendant's evaluation consisted of intellectual and personality testing.  The intellectual testing involved obtaining an intelligence quotient (IQ).  Defendant had a full scale IQ of 67.  As such, defendant fell "within the mildly mentally retarded to the borderline range of intellectual functioning." Tsang explained that the full scale IQ consists of two parts: a verbal IQ and a performance IQ.  The performance IQ tests nonverbal, more visual abilities whereas the verbal IQ tests word knowledge, verbal comprehension, the ability to express one's thoughts, and listening comprehension.  Tsang noted that defendant's score on the verbal IQ was much lower than his score on the performance IQ.  Defendant scored in the low average range on the performance IQ.  However, he scored a 55 on the verbal IQ, which is in the mildly mentally retarded range.

Defendant also took the Peabody Picture Vocabulary Test, which is designed to assess one's ability to take in verbal information and comprehend it.  Defendant scored in the mildly mentally retarded range on that test.  Tsang noted that the Peabody test gives an age equivalent of vocabulary knowledge.  Defendant had the comprehension of a nine-year-old.  In addition, Tsang reported that although she was unable to determine defendant's reading level, the educational staff at the Juvenile Justice Center placed defendant's reading at the first-grade level.  Based on the tests, Tsang opined that defendant would be able to understand "everyday kinds of things" but that he might have trouble understanding abstract concepts and complex sentences.  Tsang stated that the best way to teach someone with defendant's level of intellectual functioning would be "to use short, simple sentence[s], repetition, and it would be also very important to have them paraphrase what was being said to truly measure their understanding."  With respect to defendant's psychological evaluation, Tsang reported that defendant had difficulty understanding what was being said to him and comprehending it.  He also had difficulty expressing his own thoughts and ideas.  Tsang testified that there was no indication that defendant was not being forthright in his testing or that he was trying to trick the tester.

On cross-examination, Tsang acknowledged that defendant was not tested regarding whether he could understand 
Miranda
 warnings, despite the existence of a test to measure this ability.  
In addition, Tsang admitted that the tests revealed that defendant was capable of expressing himself if he was having difficulty comprehending something.  Tsang also acknowledged that defendant's "general intelligence, measured in a manner not dependent on verbal skills, appears to be close to normal" but that defendant "may require some assistance from his attorney to fully understand the court proceedings."

Defendant testified that he attended school until ninth grade.  According to defendant, he went to a "special school" and read only picture books with simple sentences.  Defendant testified that he did not understand what Downs read to him on July 2, 1998.  According to defendant, he told Downs that he understood his rights because he was "scared."  Defendant also testified that he was able to read only "a couple words" on the sheet of paper that Downs gave him.  Defendant testified that he placed his initials next to each one of the rights only because he was "scared" and he "didn't know what to do."  Defendant also testified that he did not understand the waiver provision, but that he initialed that section to "get it over with."  Defendant believed that the officers would stop questioning him once he signed the form.  Defendant could not recall his encounter with Sanchez-Podschweit.  However, he stated that he has never been able to read, so he could not have read the waiver-of-rights provision to her.

On cross-examination, defendant admitted that his arrest on July 2, 1998, was not the first time he was arrested or given 
Miranda
 warnings
.  Defendant reiterated that he thought that the officers would stop questioning him if he initialed and signed the form.  However, he also admitted that after he signed the form, the officers asked him if he was willing to talk to them and that he agreed to do so.  On redirect examination, defendant testified that he did not understand his 
Miranda
 rights on the occasions that they were given to him prior to July 2, 1998.  However, defendant acknowledged that on the previous occasions that he was given 
Miranda
 warnings, he told the officers that he understood them in the hope that they would stop questioning him.

The parties stipulated to the testimony of two witnesses, Officer Kip Rose and Rebecca Payette Nilles, both of the Aurora police department.  If called as a witness, Rose would testify that defendant was arrested on July 23, 1997, as a suspect in a residential burglary.  Rose would further testify that on July 24, 1997, at 1:50 a.m., defendant was brought to an interview room at the Aurora police department and that juvenile investigator Sanchez-Podschweit read defendant his 
Miranda
 warnings from a preprinted form.  Sanchez-Podschweit read the first five statements to defendant, asking after each statement if defendant understood.  Sanchez-Podschweit then asked defendant to read the first statement out loud and to initial all of the statements if he understood his rights.  Defendant did so.  Sanchez-Podschweit then instructed defendant to read out loud the two statements in the waiver provision and to initial them if he wished to speak to Rose about the burglary.  Defendant initialed the two statements and signed the waiver.

Nilles would testify that she was a juvenile officer with the Aurora police department on August 20, 1996.  On that date, at approximately 2 a.m., Nilles was present for an interview of defendant in connection with the theft of a credit card.  Nilles would testify that she gave defendant his 
Miranda
 rights and that defendant read the rights aloud from the preprinted form.  When defendant had some trouble reading the words, Nilles assisted defendant and inquired if he understood each of the rights.  Defendant informed Nilles that he understood them.  Defendant then read the waiver provision and stated that he understood it.

Prior to concluding, the court viewed the recording of defendant's interrogation.  It then took the matter under advisement.  On February 5, 2002, the court announced its decision to deny defendant's motion to suppress.  In support of its decision, the court made the following factual findings.  At the time of the interview, defendant was 49 days shy of his seventeenth birthday.  Defendant was a ninth grader with an IQ of 67 who told the police that he did not read English very well.  Downs read defendant his rights from a preprinted form.  When Downs asked
 defendant whether he understood his rights, defendant responded in the affirmative.  Defendant correctly read out loud the first right.  Defendant was instructed to read the remaining rights to himself.  It appeared as if defendant read the form, and after the passage of an appropriate time, defendant initialed each of the rights.  Defendant then signed the form, indicating that he wished to waive his rights.  This was the third time within two years that defendant had been advised of his 
Miranda
 rights.  On the prior occasions, defendant indicated that he understood his rights and he signed the waiver.

The court also found that the interview in the present case was short, direct, and uncomplicated.  Defendant responded to the questions in a manner that indicated that he understood the questions.  The police did not threaten defendant or make any promises to him.  The court found that the failure of the police to contact defendant's parents was a violation of the law.  The court noted that despite defendant's inquiry whether the police had called his parents, no one determined whether the call had been made and no one then made the call.  However, the court found that defendant's inquiry did not comprise a request to speak with his parents.  He merely asked whether they had been called.  Moreover, the court noted that the failure to notify defendant's parents did not automatically require suppression of his statement.  Based on the totality of the circumstances, the court determined that defendant's statement was the result of his own decision and was not the result of compulsion or inducement and that defendant's will was not overborne.

Subsequently, the case proceeded to trial.  Ultimately, the jury found defendant guilty of one count of attempt (first-degree murder) (720 ILCS 5/8--4(a), 9--1(a)(1) (West 1998)), four counts of aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 1998)), and five counts of aggravated discharge of a firearm (720 ILCS 5/24--1.2(a)(2) (West 1998)).  As noted above, the trial court merged defendant's convictions of aggravated discharge of a firearm into his other convictions.  The court sentenced defendant to terms of six years' imprisonment on three of the convictions of aggravated battery with a firearm and to a term of nine years' imprisonment on the remaining conviction of aggravated battery with a firearm.  The court ordered these sentences to run consecutively on the basis of severe bodily harm.  The court also imposed a concurrent sentence of 14 years' imprisonment for attempt.  This appeal followed the disposition of defendant's posttrial motion.

II.  ANALYSIS

A.  Defendant's Statement

On appeal, defendant argues that two circumstances rendered his statement involuntary.  First, he asserts that given his low IQ and the fact that he does not possess the ability to read beyond a first-grade level, he lacked the mental capacity to understand the 
Miranda
 warnings and the waiver of rights.  Second, defendant contends that the failure of the police to contact his parents despite his request that they do so also rendered his statement involuntary.

In determining whether a defendant's confession was voluntary, the test is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he or she confessed.  
People v. Gilliam
, 172 
Ill. 2d
 484, 500 (1996); 
In re L.L.
, 295 
Ill. App. 3d
 594, 600 (1998).  In assessing the voluntariness of a statement, we accord great deference to the factual findings of the trial court and will reverse those findings only if they are against the manifest weight of the evidence.  
People v. Morgan
, 197 
Ill. 2d
 404, 437 (2001).  However, we apply the 
de novo
 standard of review when considering the ultimate question of the voluntariness of a confession.  
In re G.O.
, 191 
Ill. 2d
 37, 50 (2000).

Taking a juvenile's confession is a "sensitive concern." 
People v. Prude
, 66 
Ill. 2d
 470, 476 (1977).  Accordingly, our supreme court has cautioned that great care must be taken to assure that the confession was neither coerced or suggested nor the product of ignorance of rights, adolescent fantasy, fright, or despair.  
In re W.C.
, 167 
Ill. 2d
 307, 328 (1995); 
Prude
, 66 
Ill. 2d
 at 476, quoting 
People v. Simmons
, 60 
Ill. 2d
 173, 180 (1975).  To this end, courts in Illinois examine the totality of the circumstances in determining the voluntariness of a confession.  
Morgan
, 197 
Ill. 2d 
at 437.  Factors to consider include the defendant's age, education, intelligence, background, experience, mental capacity, and physical condition; the legality of the detention; the duration of the questioning; whether the defendant was informed of his constitutional rights; whether the defendant was subjected to any physical or mental abuse by the police; the defendant's previous experience with the criminal justice system; and whether the confession was induced by police deception.  
Morgan
, 197 
Ill. 2d
 at 437; 
People v. Haynie
, 347 Ill. App. 3d 650 (2004); 
People v. Cunningham
, 332 
Ill. App. 3d
 233, 243 (2002); 
People v. Brown
, 301 
Ill. App. 3d
 995, 1002 (1998).  Where juveniles are concerned, additional factors to consider include the time of day when the questioning occurred and whether a parent or other adult concerned about the juvenile's welfare was present during questioning.  
Brown
, 301 
Ill. App. 3d
 at 1002.  No one factor is dispositive.  
People v. Pogue
, 312 
Ill. App. 3d
 719, 727 (1999).

After reviewing the record, including the videotape of defendant's interrogation, we agree with the trial court that the totality of the circumstances indicates that defendant's confession was voluntary.  We first address defendant's contention that his statement to police should have been suppressed in light of his low IQ and reading ability.

At the outset, we note that mental deficiency of itself does not render a statement involuntary.  
W.C.
, 167 
Ill. 2d 
at 328; 
People v. Quezada
, 335 
Ill. App. 3d
 233, 247 (2002).  It is but one factor to consider in the totality of the circumstances.  
W.C.
, 167 
Ill. 2d
 at 328.  Defendant was about 16 years 10 months old at the time the events in this case transpired.  Defendant attended school only until the ninth grade, was enrolled in a "special school," and, with a full scale IQ of 67, was described as "mildly mentally retarded."  In addition, defendant had the vocabulary comprehension of a nine-year-old child.  Despite this evidence, there was no indication that defendant could not understand his rights.  Downs read defendant his rights out loud.  He asked defendant if he understood his rights.  Defendant responded in the affirmative.  Defendant then appeared to read his rights on his own, and he initialed the form as an indication that he understood his rights.  Further, although defendant was purportedly tested at a first-grade reading level, Sauer and Downs testified that defendant was able to read aloud the first right listed on the form.  In short, there was simply no evidence that defendant did not understand his rights or his waiver.

More significantly, we find that defendant's previous experience with the criminal justice system belies any claim that his mental capacity rendered his statement involuntary.  
Indeed, defendant displayed a familiarity with the interrogation process by asking Sauer whether the police had contacted his parents.  See 
Quezada
, 335 
Ill. App. 3d
 at 247.  In addition, prior to his arrest in this case, defendant had been read his 
Miranda
 rights on at least two previous occasions.  In August 1996, defendant was apprehended in connection with the theft of a credit card.  At that time, the juvenile officer gave defendant a preprinted form listing his 
Miranda
 rights.  Defendant read the rights back to the officer.  Although defendant had some trouble reading, the officer assisted defendant.  Upon inquiry, defendant informed the officer that he understood the rights.  Defendant also read the waiver provision and told the officer that he understood it.  In 1997, defendant was taken into custody in connection with a residential burglary.  At that time, a juvenile officer read defendant his rights.  
Defendant informed the officer that he understood each right.  The officer then had defendant read the first right out loud.  Defendant did so correctly.  Per the officer's instructions, defendant then initialed each right as an indication that he understood it.  The officer then instructed defendant to read out loud the waiver provision and to initial it if he wished to speak to the police about the offense.  Defendant complied.  As demonstrated above, at no time on either of these previous occasions did defendant indicate that he did not understand his rights or the meaning of the waiver provision.

Moreover, we note that other courts have upheld the denial of a motion to suppress in cases in which the minor's IQ was less than or approximated a score of 67.  See 
W.C.
, 167 
Ill. 2d
 at 330-35 (noting that although juvenile scored a 47 or 48 on an IQ test, psychologist believed that score was depressed and that juvenile's IQ was actually between 60 and 70); 
People v. Ball
, 322 
Ill. App. 3d
 521, 527-34 (2001) (full scale IQ of 69); 
People v. Davis
, 191 
Ill. App. 3d
 163, 167-71 (1989) (full scale IQ of 61); 
People v. Clements
, 135 
Ill. App. 3d
 1001, 1005-08 (1985) (IQ of 58).

Of more concern is the failure of the police to notify defendant's parents of his arrest.  Essentially, defendant asks us to endorse a policy whereby the failure of the police to contact a minor's parents automatically results in a finding that the juvenile's statements were involuntary.

Section 5--405 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5--405 (West 1998)) requires a law enforcement officer who arrests a minor to "immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been arrested and where [the minor] is being held."  The purpose of this provision is " 'to allow, where possible, [a] concerned adult to confer and counsel with the juvenile 
before
 interrogation and confession.' "  (Emphasis in original.)  
L.L.
, 295 
Ill. App. 3d
 at 601, quoting 
People v. Montanez
, 273 
Ill. App. 3d
 844, 850 (1995).  In 
Quezada
, 335 
Ill. App. 3d
 at 245-46, this court held that the Elgin police department violated section 5--405 of the Act when it waited to contact the juvenile defendant's father 
until one hour after the arrest despite the opportunity to contact the parent earlier.  Obviously, if the failure to "immediately" notify parents of their child's arrest violates section 5--405, the utter failure of the police to contact a juvenile's parents violated the legislature's mandate as well.

The trial court described the failure of the Aurora police department to notify defendant's parents as "careless," "disturbing," and "unprofessional."  We agree with the trial court's assessment.  It is of no consequence that Sauer thought that another officer had contacted defendant's parents.  Admittedly, the legislature placed the onus of notifying a minor's parents with the law enforcement officer who arrests the minor.  However, we do not believe that it is too burdensome for either the juvenile officer or the officer who interviews the juvenile to make sure that the minor's parents have indeed been notified and, if they have not been contacted, to notify the parents as soon as possible.

Nevertheless, while we do not condone the procedure employed by the Aurora police department, we decline to automatically suppress a juvenile's statements solely on the basis that the juvenile's parents were not notified of the juvenile's arrest and where he or she is being held.  While police conduct that frustrates a parent's attempt to confer with his or her child is a significant factor in the totality-of-the-circumstances analysis (
People v. Griffin
, 327 
Ill. App. 3d
 538, 545 (2002)), our supreme court has rejected a rule that the failure to notify a juvenile's parents that the minor has been taken into custody is sufficient 
per se
 to mandate suppression of the minor's statements (see 
Morgan
, 197 
Ill. 2d
 at 440 (holding that the failure of the police to contact the defendant's parents does not automatically render the defendant's statements to police involuntary); 
G.O.
, 191 
Ill. 2d
 at 55 ("a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation")).  Likewise, this court has previously held that noncompliance with section 5--405 is but one factor to consider in assessing the totality of the circumstances.  
Quezada
, 335 
Ill. App. 3d
 at 246; see also 
Clements
, 135 
Ill. App. 3d
 at 1007 ("Here, the record shows that defendant resided with his guardian and that no one had been contacted before the interrogation.  While this fact does not require suppression, we will consider it in deciding *** voluntariness").  In a situation such as this, where the police have not contacted the juvenile's parent prior to the interrogation, the relevant inquiry is whether the absence of a parent or other adult interested in the minor's welfare contributed to a coercive atmosphere.  See 
Griffin
, 327 
Ill. App. 3d
 at 546; 
Pogue
, 312 
Ill. App. 3d
 at 728.

Indeed, defendant suggests that the police chose not to contact defendant's parents in order to create a more coercive atmosphere.  However, we do not find that the atmosphere under which defendant was interrogated was coercive.  Notably, neither Sauer nor Downs was armed, and there was no evidence that the officers threatened or made any promises to defendant prior to or during the interview.  In addition, the interview occurred at about 10:30 p.m., and defendant was not handcuffed during the interview.

Recently, our supreme court provided some additional considerations for courts to examine in assessing the voluntariness of a juvenile's confession where the juvenile's parents were not notified of his or her arrest by police.  
Morgan
, 197 
Ill. 2d
 at 440-41.  These considerations include: (1) whether the juvenile requested to speak with an adult concerned with the juvenile's welfare; (2) whether the police prevented a concerned adult from speaking with the juvenile; (3) whether the juvenile's detention was valid; (4) whether the juvenile was informed of his 
Miranda
 rights and indicated that he understood them; (5) whether the juvenile was intelligent and did well in school; (6) the duration of the juvenile's interrogation; and (7) whether the police threatened or made promises to the juvenile.  See also 
G.O.
, 191 
Ill. 2d
 at 56.

Applying the aforementioned considerations to this case demonstrates that the failure of the police to notify defendant's parents of his arrest did not render his statement involuntary.  Here, defendant never asked to speak with a concerned adult.  Although there was testimony that defendant may have asked whether his parents had been contacted, the trial court found that this inquiry was not tantamount to asking to speak with his parents.  We cannot say that this finding was against the manifest weight of the evidence.  Additionally, the officers did not prevent a concerned adult from speaking with defendant, there is no suggestion that defendant's detention was invalid, and the interview lasted only 20 minutes.  Moreover, although defendant was classified as "mildly mentally retarded," he was informed of his 
Miranda
 rights, and at the time of his interview, he indicated that he understood them.  Defendant now claims that he told the officers that he understood his rights only because he was "scared."  However, we again pointed out that defendant had previous experience in the criminal justice system.  On the two previous occasions in which defendant had been read his 
Miranda
 rights, he informed the officers that he understood his rights.  Finally, as we pointed out above, 
the police did not threaten or make any promises to defendant prior to or during the interview.  Accordingly, based on the totality of the circumstances, we affirm the decision of the trial court denying defendant's motion to suppress his statement.

B.  Sentencing Issue

Alternatively, defendant argues that the sentences imposed on his convictions of aggravated battery with a firearm should be modified to run concurrently because there was no evidence that the victims suffered severe bodily injury.  We disagree.

Four individuals were injured in the shooting.  At defendant's trial, the following evidence was presented regarding the extent of the victims' injuries.  Sergio Castellanos sustained shotgun wounds to the forehead, left cheek, top of his head, and abdomen.  Castellanos testified that he was in so much agony from the wound on the top of his head that he thought his head had been blown off.  All Castellanos saw was blood.  Castellanos's brother, who was nearby, wrapped Castellanos's head in a shirt.  Castellanos was transported to the hospital by ambulance.  At the hospital, the doctors tended to his wounds and took X rays.  Castellanos was released from the hospital after six hours.  When Castellanos left the hospital, he still had projectile fragments in his abdomen, cheek, and forehead.  Two to three weeks after the shooting, the fragments in his cheek and abdomen fell out in a process that Castellanos described as "painful."  At the time of trial, a fragment remained in Castellanos's forehead.

Cynthia Cavazos, Justin's mother, testified that at the time of the shooting, she was at the park with her two sons and two of her cousins.  Justin was seven years old at the time.  When Cavazos heard the gunshots, she ran toward her children.  Cavazos discovered that Justin had been shot in the collar bone and in the right cheek and that he was bleeding from those areas.  Justin was also crying.  Justin was transported to the hospital by ambulance.  Cavazos estimated that Justin was at the hospital for two hours.  The doctors removed a bullet fragment from Justin's collar bone.  However, the fragment lodged in Justin's cheek remained for some time.

Guillermo Pacheco testified that he was struck by a projectile on the inside of his right leg.  Pacheco realized that he was shot when his leg could not move and he was in "tremendous pain."  Pacheco observed "a big hole [with] blood coming out [of his leg]."  Pacheco was taken to a hospital by ambulance.  There, doctors diagnosed Pacheco with a shattered femur requiring the implantation of a metal rod.  Pacheco spent eight days at the hospital.  After his release, Pacheco underwent therapy for eight months and required a nurse to take care of him at home.  At the time of trial, the projectile and the metal rod were still in Pacheco's leg.  In addition, Pacheco testified that he still experiences intense pain in his leg.

Samuel Perez was shot in the leg.  After an overnight stay at the hospital, Perez was discharged on July 3, 1998, at 3:30 p.m.  Upon discharge, a foreign body remained in Perez's leg, and his injuries required physical therapy.

In sentencing defendant, the trial court recalled the evidence set forth above.  The court sentenced defendant to four consecutive sentences ranging from six to nine years for each of the four convictions of aggravated battery with a firearm.  The term of imprisonment for these convictions totaled 27 years.

Section 5--8--4(a) of the Unified Code of Corrections (Code) provides in relevant part:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury *** in which event the court shall enter sentences to run consecutively."  730 ILCS 5/5--8--4(a) (West 1998).

We note that aggravated battery with a firearm is a Class X felony.  720 ILCS 5/12--4.2(b) (West 1998).  Moreover, a trial court's decision with regard to sentencing is entitled to great deference, and a reviewing court should not substitute its judgment for that of the sentencing court absent an abuse of discretion.  
People v. Durham
, 312 
Ill. App. 3d
 413, 420 (2000).

Defendant focuses on the injuries sustained by Castellanos and Justin.  He argues that the mere fact that a victim sustains a gunshot wound does not require a finding that the victim's injury was "severe."  Additionally, he asserts that "where two of the victims were essentially treated and released from the emergency room, the trial court's finding of severe bodily harm, which mandates that the sentences run consecutive, must be reversed."

In 
People v. Mays
, 91 
Ill. 2d
 251, 256 (1982), the supreme court defined "bodily harm" in the context of a simple battery as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent."  The statute at issue here requires the defendant to inflict "severe bodily harm."  Consequently, it requires " 'an injury of a graver and more serious character' " than simple bodily harm.  See 
People v. Ruiz
, 312 
Ill. App. 3d
 49, 62 (2000), quoting 
People v. Figures
, 216 
Ill. App. 3d
 398, 401 (1991).  Moreover, we accept defendant's position that a gunshot wound does not automatically qualify as "severe bodily harm."  See 
People v. Austin
, 328 
Ill. App. 3d
 798, 808 (2002); 
People v. Murray
, 312 
Ill. App. 3d
 685, 694 (2000) (noting that the victim suffered a gunshot wound to the big toe causing a fracture, but required a hospitalization of only 2½ hours).  Nevertheless, we believe that the injuries suffered by Castellanos and Justin were sufficient for the trial court in its discretion to find severe bodily injury.  See 
People v. Knight
, 139 
Ill. App. 3d
 188, 196-97 (1985).  Notably, Castellanos and Justin sustained more than a mere laceration, bruise, or abrasion.  Both victims sustained multiple gunshot wounds to the head and torso.  Both required medical attention.  Admittedly, they were released from the hospital within hours of their arrival.  However, they left the hospital with bullet fragments lodged in their bodies.  The fragments remained in their bodies for weeks.  Moreover, Castellanos testified that he still had a fragment in his forehead.  Th
us, the trial court did not abuse its discretion in ordering defendant's convictions of aggravated battery of a firearm to run consecutively.

In closing, we note that defendant's reliance on 
People v. Jones
, 323 
Ill. App. 3d
 451 (2001), and 
Durham
, 312 
Ill. App. 3d
 413, is misplaced.  
In those cases, the nature of the victims' injuries was far less severe.  Moreover, neither of the victims sought medical treatment as a result of his wounds.  For instance, in 
Jones
, the victim's right cheek was grazed by a bullet, but he did not seek medical treatment for his injury.  
Jones
, 323 
Ill. App. 3d
 at 461.  In 
Durham
, the victim suffered " 'a small nick or cut' " and he refused medical treatment for the wound.  
Durham
, 312 
Ill. App. 3d 
at 421.  Finally, defendant cites to 
Murray
, 312 
Ill. App. 3d
 685, for the proposition that the length of a victim's hospital stay is probative of whether the victim suffered severe bodily harm.  We find, however, that the length of one's hospital stay is not determinative; rather, it is but one factor to consider.  See 
Figures
, 216 
Ill. App. 3d
 at 401.

For the foregoing reasons, 
the judgment of the circuit court of Kane County is affirmed.

Affirmed.

O'MALLEY, P.J., and BOWMAN, 
J., concur.